Nos. 22-15529, 22-15532, 22-15534, 22-15535, 22-15536,
22-15537, 22-15626, 22-15627, 22-15628

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

DEFENDERS OF WILDLIFE, et al.,
*Plaintiffs/Appellees,*

v.

UNITED STATES FISH AND WILDLIFE SERVICE, et al.,
*Defendants/Appellants*

and

STATE OF UTAH, et al.,
*Intervenor Defendants/Appellants.*

Appeal from the United States District Court for the Northern District of California
Nos. 4:21-cv-344, 4:21-cv-349, and 4:21-cv-561 (Hon. Jeffrey S. White)

**FEDERAL APPELLANTS' OPENING BRIEF**

TODD KIM
*Assistant Attorney General*

JOAN M. PEPIN
MICHAEL R. EITEL
ASTRID CEVALLOS
Of Counsel:                                AMELIA G. YOWELL
                                           *Attorneys*
KRISTEN BYRNES FLOOM         Environment and Natural Resources Division
*Attorney*                               U.S. Department of Justice
U.S. Department of the Interior     Post Office Box 7415
Office of the Solicitor                 Washington, D.C. 20044
                                           (202) 514-5580
                                           amelia.yowell@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY ....................................................................................ix

INTRODUCTION ............................................................................1

STATEMENT OF JURISDICTION.....................................................4

STATEMENT OF THE ISSUES........................................................4

PERTINENT STATUTES AND REGULATIONS ................................5

STATEMENT OF THE CASE...........................................................5

    A.    The Endangered Species Act...............................................5

        1.    The definition of species .........................................6

        2.    The five factors for determining a species' status .....................6

    B.    The Recovery and Delisting of the Gray Wolves ...............8

        1.    Gray wolf biology ...................................................8

        2.    The listing and recovery of gray wolves....................9

        3.    The Service's previous regulatory efforts and related litigation .....................................................14

        4.    The 2020 delisting rule ..........................................17

    C.    Proceedings below..............................................................19

SUMMARY OF ARGUMENT ..........................................................21

STANDARD OF REVIEW ...............................................................24

ARGUMENT ...................................................................................................25

I.   The district court's decision rests on the incorrect assumption
     that the ESA requires restoration of a species throughout its
     historical range.......................................................................................25

     A.   The Service carefully analyzed all listed wolves, not just
          segments of the entities. ...................................................................28

          1.   The Service's biological decision to focus on core
               metapopulations does not mean it overlooked other
               gray wolves. ............................................................................30

          2.   The Service's approach is consistent with *Humane
               Society*. ....................................................................................32

     B.   The Service appropriately considered lost historical
          range. ..................................................................................................34

II.  The district court erred in rejecting the Rule's evaluation of
     "significant portion of its range." .............................................................40

     A.   The ESA delegates to the Service the task of judging
          "significant" on a species-by-species basis. ....................................41

     B.   The Service's application of "significant" was not
          arbitrary or capricious. ......................................................................45

III. The district court improperly substituted its understanding of
     the genetics of Western wolves for that of the Service. ...............................52

IV.  The Service rationally concluded that regulatory mechanisms
     were adequate. ...........................................................................................57

CONCLUSION ...............................................................................................61

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Alaska Dep't of Env't Conservation v. Env't Prot. Agency*,
540 U.S. 461 (2004).................................................................................48

*Am. Elec. Power Co. v. Connecticut*,
564 U.S. 410 (2011).................................................................................44

*Bonnichsen v. United States*,
367 F.3d 864 (9th Cir. 2004) ......................................................................35

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020).................................................................................43

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984).............................................................................36, 41

*City of Arlington v. Fed. Commc'ns Comm'n*,
569 U.S. 290 (2013).................................................................................47

*Crow Indian Tribe v. United States*,
965 F.3d 662 (9th Cir. 2020) ................................................16, 29, 32, 33, 34

*Ctr. for Biological Diversity v. Jewell*,
248 F. Supp. 3d 946 (D. Ariz. 2017) ...........................................................40

*Ctr. for Biological Diversity v. Zinke*,
900 F.3d 1053 (9th Cir. 2018) ...........................................................35, 36, 56

*Defs. of Wildlife v. Norton*,
258 F.3d 1136 (9th Cir. 2001) ......................................................25, 26, 43, 48

*Defs. of Wildlife v. Zinke*,
849 F.3d 1077 (D.C. Cir. 2017)...............................................................15, 49

*Desert Survivors v. U.S. Dep't of Interior*,
321 F. Supp. 3d 1011 (N.D. Cal. 2018)........................................................40

*Forest Guardians v. U.S. Forest Serv.*,
329 F.3d 1089 (9th Cir. 2003) ...................................................25

*Friends of Blackwater v. Salazar*,
691 F.3d 428 (D.C. Cir. 2012)...........................................58, 59

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014).........................................................36

*Humane Soc'y of the U.S. v. Pritzker*,
548 F. App'x 355 (9th Cir. 2013)......................................48

*Humane Soc'y of the U.S. v. Zinke*,
865 F.3d 585 (D.C. Cir. 2017)................................. 16, 29, 32, 33, 34, 35, 36

*Kisor v. Wilkie*,
588 U.S. 558 (2019).........................................................43

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024)............................... 36, 41, 42, 43, 44, 45

*Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*,
73 F.4th 657 (9th Cir. 2023) ...........................................45, 47, 49

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989).........................................................44, 56

*Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)...........................................................24

*Native Ecosystems Council v. Weldon*,
697 F.3d 1043 (9th Cir. 2012) ........................................24

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
475 F.3d 1136 (9th Cir. 2007) ........................................31, 53, 57

*Pac. Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*,
---- F.4th ----, 2024 WL 3908398
(D.C. Cir. Aug. 23, 2024) ...............................................41

*Protect Our Cmtys. Found. v. Jewell*,
    825 F.3d 571 (9th Cir. 2016) ........................................................52

*Ranchers Cattlemen Action Legal Fund*
    *United Stockgrowers of Am. v. U.S. Dep't of Agric.*,
    415 F.3d 1078 (9th Cir. 2005) ......................................................48

*River Runners for Wilderness v. Martin*,
    593 F.3d 1064 (9th Cir. 2010) ......................................................44

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ........................................................52

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ........................................................24

*The Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ........................................................49

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) .....................................................................25

*Trout Unlimited v. Lohn*,
    559 F.3d 946 (9th Cir. 2009) .................................................52, 56

*Trump v. Hawaii*,
    585 U.S. 667 (2018) .....................................................................47

*W. Watersheds Project v. Ashe*,
    948 F. Supp. 2d 1166 (D. Idaho 2013) .........................................49

## Statutes and Court Rules

Administrative Procedure Act

    5 U.S.C. § 706(2) ............................................................................4

    5 U.S.C. § 706(2)(A) ...............................................................24, 44

Marine Mammal Protection Act

    16 U.S.C. § 1389(b)(1) ...................................................................48

Endangered Species Act

    16 U.S.C. § 1531(b) ..................................................................5, 25

    16 U.S.C. § 1532(3) ..................................................................5, 25

    16 U.S.C. § 1532(6) ..............................................5, 25, 34, 40, 42

    16 U.S.C. § 1532(15) .....................................................................5

    16 U.S.C. § 1532(16) ..................................................................6, 11

    16 U.S.C. § 1532(20) ..................................................5, 25, 34, 40

    16 U.S.C. § 1533(a)(1) .......................... 5, 7, 19, 27, 32, 34, 42, 57

    16 U.S.C. § 1533(a)(1)(D) .......................................................57, 58

    16 U.S.C. § 1533(a)(2) ...................................................................5

    16 U.S.C. § 1533(b)(1)(A) .............................................................7

    16 U.S.C. § 1533(b)(3) ...................................................................7

    16 U.S.C. § 1533(c) .............................................................7, 14, 32

    16 U.S.C. § 1533(c)(1) ...................................................................5

    16 U.S.C. § 1533(g) .......................................................................7

    16 U.S.C. § 1533(g)(2) ...................................................................8

    16 U.S.C. § 1540(g) .......................................................................4

28 U.S.C. § 1291 .................................................................................4

28 U.S.C. § 1331 .................................................................................4

Pub. L. No. 93-205, 87 Stat. 884 .........................................................6, 11

Pub. L. No. 112-10, 125 Stat. 38 ............................................................15

Fed. R. App. P. 4(a)(3)..............................................................................4

## Regulations

50 C.F.R. § 402.01(b) (2019)....................................................................5

50 C.F.R. § 402.02 (2019) ........................................................................7

50 C.F.R. § 424.11(e)(2) (2019) .........................................................7, 25

32 Fed. Reg. 4001 (Mar. 11, 1967).........................................................10

38 Fed. Reg. 14678 (June 4, 1973) .........................................................10

39 Fed. Reg. 1171 (Jan. 4, 1974)............................................................10

43 Fed. Reg. 9607 (Mar. 9, 1978)..............................................10, 11, 12

74 Fed. Reg. 15123 (Apr. 2, 2009) .........................................................15

76 Fed. Reg. 25590 (May 5, 2011) .........................................................15

76 Fed. Reg. 81666 (Dec. 28, 2011) .......................................................16

77 Fed. Reg. 55530 (Sept. 10, 2012) ......................................................15

79 Fed. Reg. 37578 (July 1, 2014).........................................35, 36, 37, 40

80 Fed. Reg. 2488 (Jan. 16, 2015) ..........................................................12

82 Fed. Reg. 20284 (May 1, 2017) .........................................................15

85 Fed. Reg. 69778 (Nov. 3, 2020).........................................................2

87 Fed. Reg. 76882 (Dec. 15, 2022)........................................................26

88 Fed. Reg. 11600 (Feb. 23, 2023) ........................................................26

89 Fed. Reg. 8391 (Feb. 7, 2024) ...........................................................19

## Other Authorities

*Oxford English Dictionary* (1978) ...........................................................43

*Webster's Third New International Dictionary* (1976) ...........................................43

Brian K. Scheick & Walter McCown,
    *Geographic Distribution of American
    Black Bears in North America*, 25 Ursus, no. 2, 2014 ...................................26

# GLOSSARY

APA             Administrative Procedure Act

DPS             Distinct Population Segment

ESA             Endangered Species Act

SPR             Significant Portion of its Range

# INTRODUCTION

In 1978, gray wolves largely existed in the lower United States in one small, but tenacious population in Minnesota. Government-sponsored eradication programs and western settlers had nearly eliminated wolves everywhere else. The U.S. Fish and Wildlife Service (the Service) thus listed gray wolves under the Endangered Species Act (ESA) as threatened in Minnesota and endangered in the lower 48 states and Mexico.

In the many decades since then, the Service has focused on recovering gray wolves in three geographic regions: the Northern Rocky Mountains, the Eastern United States including the Great Lakes region, and the Southwest subspecies of Mexican wolves (which are not at issue here). Thanks to the conservation and management efforts of the Service, other federal agencies, states, Tribes, and private conservation partners, gray wolves now exist in the lower United States in two large, thriving metapopulations in the Northern Rocky Mountains and the Great Lakes. Both metapopulations are also connected to large networks of wolves in Canada, boosting their long-term security.

Despite this achievement, the Service's efforts to recognize the recovery of gray wolves have been controversial. After several attempted rulemakings and years of litigation, the Service successfully delisted the Northern Rocky Mountain wolves

in 2011. That left the gray wolf listed as threatened in Minnesota and endangered in 44 states and Mexico (the 44-state entity).

In 2020, the Service found that the best available science continued to show that the listed gray wolf entities were no longer threatened or endangered under the ESA. It thus embarked on a rulemaking that dealt with the unique listing history and navigated the complicated regulatory and judicial background. The Service ultimately published a 117-page Rule delisting the 44-state entity and the Minnesota entity. 85 Fed. Reg. 69778 (Nov. 3, 2020) (3-ER-304–421). This appeal is about the validity of that Rule based on its administrative record.

Heeding its obligations under the ESA and intervening judicial precedent, the Service carefully evaluated the listed entities and other gray wolf configurations to ensure that it did not remove protections for any wolves that might qualify as an endangered or threatened species. To do so, the Service analyzed the ESA's five factors and applied them to three configurations of wolves: each listed entity separately, the listed entities together, and all wolves in the lower 48 states, including the listed entities and the previously delisted Northern Rocky Mountain wolves. After that thorough analysis, the Service concluded that no configuration of gray wolves was threatened or endangered in all or a significant portion of its range. That analysis was well-reasoned and well-supported by the administrative record. Of course, if the Court disagrees, it can remand to the Service. But the Court should

correct the district court's misunderstanding of both the ESA and the role of a reviewing court under the Administrative Procedure Act (APA).

At its core, this appeal is about whether the purpose of the ESA is to recover endangered and threatened species to the point where they are no longer in danger of extinction, or whether it goes beyond that objective to require that a species be restored to its historical range before delisting. The ESA is clear: its goal is to prevent extinction, not to restore species to their pre-western settlement numbers and range. Only species that are in danger of extinction or likely to become endangered in the foreseeable future may be listed and protected under the ESA. Species that have recovered are removed from the list and management returned to the states or other appropriate entities. After delisting, the Service monitors species to ensure their recovery is sustained. Indeed, in this case, the Service has commenced a nationwide dialogue to encourage wolf conservation after delisting. But Congress has not authorized the federal government to indefinitely retain the extraordinary protections of the ESA for species that are no longer threatened or endangered.

The district court misunderstood the ESA's clear mandate and compounded that error by imposing its own views of the science. Its decision invalidating the Rule should be reversed.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arose under the ESA, 16 U.S.C. § 1540(g), and the APA, 5 U.S.C. § 706(2). 2-ER-292–300.

The district court entered final judgment for the Plaintiffs on February 10, 2022. 1-ER-2–3. Intervenor defendants filed notices of appeal on April 11, 2022. The Service filed timely notices of appeal on April 25, 2022. *See* Fed. R. App. P. 4(a)(3); 4-ER-592–93. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the district court misunderstood the ESA to require restoration of a species in all areas of its historical range by holding that:

> a.     the Service should have focused more on lone and dispersing wolves outside the two core populations; and
>
> b.     the Service should have directly analyzed threats to wolves in areas where wolves no longer exist.

2.     Whether the district court erred by rejecting the Service's "significant portion of its range" analysis.

3.     Whether the district court inappropriately substituted its own scientific judgment about the genetic makeup of West Coast wolves for that of the agency.

4.     Whether the district court improperly discounted the Service's evaluation of existing regulatory mechanisms.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are in the attached Addendum.

## STATEMENT OF THE CASE

### A.     The Endangered Species Act

Congress enacted the ESA to "provide a program for the conservation of . . . endangered species and threatened species" and to conserve "the ecosystems upon which [such] species depend."  16 U.S.C. § 1531(b).  The Act's primary goal is "to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary."  *Id.* § 1532(3).

The ESA directs the Secretary of the U.S. Department of the Interior[1] to maintain a list of threatened and endangered species.  *Id.* § 1533(a)(1), (c)(1).  An endangered species is one that "is in danger of extinction throughout all or a significant portion of its range."  *Id.* § 1532(6).  A threatened species is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).

---

[1] The Secretaries of the Interior and the U.S. Department of Commerce share responsibilities for administering the ESA.  16 U.S.C. §§ 1532(15), 1533(a)(2).  Those responsibilities have been delegated to the Fish & Wildlife Service, under Interior, and the National Marine Fisheries Service, under Commerce.  50 C.F.R. § 402.01(b).  The Fish & Wildlife Service is responsible for wolves.  *Id.*

### 1. The definition of species

As originally enacted, the ESA defined "species" to include species, subspecies, and "any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature." Pub. L. No. 93-205, 87 Stat. 884, 886 (1973). The Service listed the gray wolf (*Canis lupus*) in 1978 under this definition.

Later that same year, Congress amended the definition of "species," replacing the words "any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature" with the words "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). This amended category is commonly known as "distinct population segment" or "DPS."

### 2. The five factors for determining a species' status

Congress directed the Service to determine whether a species is endangered or threatened because of any of the following factors:

(A)   the present or threatened destruction, modification, or curtailment of its habitat or range;

(B)   overutilization for commercial, recreational, scientific, or educational purposes;

(C)   disease or predation;

(D)   the inadequacy of existing regulatory mechanisms; or

(E)  other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a)(1).  The Service bases its decisions about a species' status on these five factors, regardless of whether or how the species is already listed and regardless of whether the resulting determination leads to listing, delisting, uplisting, or downlisting the species.  The Service will delist a species if it does not meet the statutory definition of an endangered or threatened species because of these factors—i.e., when it is "recovered."  50 C.F.R. § 424.11(e)(2) (2019); *accord id*. § 402.02 ("Recovery means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act.").  To make these decisions, the Service relies on the best scientific and commercial data available.  16 U.S.C. § 1533(b)(1)(A).

The ESA requires the Service to periodically re-evaluate listed species to see if they should be removed (delisted), reclassified from threatened to endangered (uplisted), or reclassified from endangered to threatened (downlisted).  *Id.* § 1533(c). People may also petition the agency to list, delist, uplist, or downlist a species.  *Id.* § 1533(b)(3).

If after evaluating these factors the Service determines that a listed species is no longer endangered or threatened and delists it, the Service must monitor the species for at least five years.  *Id.* § 1533(g).  If that monitoring reveals a significant

risk to the recovered species, the ESA requires the Service to "make prompt use" of its emergency procedures to protect the species. *Id.* § 1533(g)(2).

## B. The Recovery and Delisting of the Gray Wolves

### 1. Gray wolf biology

The gray wolf (*Canis lupus*) is the largest wild member of the canid (dog) family. 3-ER-312. They are highly adaptable and resilient animals—they reproduce easily, survive in many different habitats, and switch their diet to exploit available food resources. 3-ER-312–13; 3-ER-428–31. Gray wolves have a circumpolar range that includes North America, Europe, and Asia. 3-ER-428.

As social animals, gray wolves normally live and hunt in packs of about 7 wolves. 3-ER-312; 3-ER-428. Packs are family groups that consist of a breeding pair, their pups, offspring from previous years, and occasionally an unrelated wolf. 3-ER-428. Litters are typically born every spring and generally produce 5 to 6 pups. 3-ER-428. Offspring usually remain with their parents for a year or two before dispersing. 3-ER-428.

Pack structure is very adaptable. 3-ER-312; 3-ER-429. Breeding members can be quickly replaced either from within or outside the pack, and pups can be reared by another pack member if their parents die. 3-ER-312–13; 3-ER-429. As a result, wolf populations can increase rapidly and survive severe disruptions if the source of mortality is reduced. 3-ER-429.

Wolves (male and female) often disperse to join another pack or find a mate to form a new pack. 3-ER-429. Dispersing wolves can travel long distances to find mates or vacant habitat. 3-ER-429. In North America, dispersing wolves typically travel around 40 to 96 miles, although some wolves have traveled more than 500 miles. 3-ER-429. These dispersals allow wolf populations to quickly expand and colonize new areas, so long as there is enough food and sufficient regulation of human-caused mortality. 3-ER-312; 3-ER-429.

Human-caused mortality is the greatest threat to gray wolves. 3-ER-320; 3-ER-432–33. But because of their high reproductive rate and mobility, established wolf populations can sustain annual mortality rates between 17% to 48% without experiencing population declines. 3-ER-430. For example, from 1999 to 2008, the wolf population in the Northern Rocky Mountain region rose at an average rate of 24% a year, even though total wolf mortality averaged roughly 16% of the population each year. 3-ER-323. From 2009 to 2015, total wolf mortality of Northern Rocky Mountain wolves increased to about 29% a year (mostly from regulated public harvest), yet that population continued to grow by around 1% annually. 3-ER-323.

### 2. The listing and recovery of gray wolves

Gray wolves once ranged throughout most of North America. 3-ER-313; 3-ER-431. Western expansion brought a pervasive and determined effort to poison,

trap, and shoot wolves, which were seen as a threat to humans and livestock. These government-sponsored eradication programs decimated gray wolves in the United States. 3-ER-318. By the mid-20th century, gray wolves were largely nonexistent in most of their historical range south of the Canadian border. Only one population of wolves persisted in the remote woods of Northeastern Minnesota. 3-ER-434. Wolf populations in Canada and Alaska, however, remained sizeable and healthy.

In the 1960s and 70s, the Service listed the Eastern Timber Wolf (*Canis lupus lycaon*) and the Northern Rocky Mountain Wolf (*Canis lupus irremotus*) as endangered species under a predecessor statute to the ESA. 32 Fed. Reg. 4001 (Mar. 11, 1967); 38 Fed. Reg. 14678 (June 4, 1973). After the ESA became law in 1973, the Service relisted the Eastern Timber Wolf and the Northern Rocky Mountain Wolf under that statute. 39 Fed. Reg. 1171, 1175 (Jan. 4, 1974). The Service also listed two other gray wolf subspecies. 3-ER-309.

In 1978, the Service issued a new rule superseding these listings. 43 Fed. Reg. 9607 (Mar. 9, 1978) (the "original listing"). The 1978 rule explained that the older listings, which focused on wolf subspecies and regional populations, were based on out-of-date taxonomic information.[2] *Id.* at 9607. Because the Service considered all subspecies and populations of *Canis lupus* south of Canada to be endangered or

---

[2] The Service has acknowledged the scientific uncertainty about whether *Canis lupis lycaon* is a separate subspecies and recognized that these wolves are instead part of the *Canis lupis* species. 3-ER-312.

threatened, it determined that "this matter can be handled most conveniently by listing only the species name." *Id.* Although the rule protected all members of *Canis lupus* in the lower 48 states, it explained that it considered the gray wolf group in Minnesota to be one "species" (threatened) and the wolves in the rest of the lower 48 states and Mexico to be another "species" (endangered). *Id.* at 9610. Those two geographic entities included large areas where wolves no longer lived and areas outside their historical range. 3-ER-308.

Congress amended the ESA to include the DPS language in 16 U.S.C. § 1532(16) (*see supra* p. 6) later that same year. The original definition of "species" contained similar language that authorized the Service to treat as a species "any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature." 87 Stat. at 886. Under that original definition, the Service listed the Minnesota population as a separate species from the wolves in the other 47 contiguous states and Mexico. 43 Fed. Reg. at 9610.

The Service never intended to recover or establish wolves everywhere in the other 47 states. 3-ER-381 ("It was never our intent to recover wolves throughout the entire geographic area encompassed by the 1978 listing."). Instead, it developed and implemented regional recovery plans in the Northern Rocky Mountains, the Eastern United States (including the Great Lakes region), and the Southwestern United States (Mexican wolves). 3-ER-305–09.

In the Southwestern United States, the Service removed the Mexican subspecies from the original listing and separately listed it as endangered in 2015. 80 Fed. Reg. 2488 (Jan. 16, 2015). It now manages that subspecies separately from other gray wolves in the lower 48 states. 3-ER-311.

For the other two regions, the Service's recovery efforts were very successful, 3-ER-437–51, although it at times faced stiff state and local resistance. Before the 1978 listing, Minnesota contained the only significant wolf population in the lower 48 states. In that listing, the remaining states and Mexico were combined into one entity because a blanket listing was a way to "conveniently" extend ESA protection to any wolves existing outside the Minnesota population. 43 Fed. Reg. at 9607. In the 1990s, the Service reintroduced 66 individual gray wolves into central Idaho and Yellowstone National Park. 3-ER-437. Since that reintroduction, the population has expanded, and continues to expand, outward into the greater Western United States. 3-ER-437. By the end of 2015, there were over 1,700 wolves in the Northern Rocky Mountain region. 3-ER-450. These wolves are also connected to over 15,000 wolves in Canada. 3-ER-450.

The population of gray wolves in the Great Lakes area also prospered with ESA protections. In Minnesota alone, the wolves expanded their range by nearly 300% and population numbers have fluctuated between 2,000 and 3,000 wolves since the early 2000s. 3-ER-443. As the Minnesota wolf population grew,

12

dispersing wolves colonized and established packs in Wisconsin and Michigan, and those populations multiplied and thrived. 3-ER-443–46. Combined, Minnesota, Wisconsin, and Michigan now regularly contain over 4,000 wolves. 3-ER-449. These wolves are connected to about 12,000–14,000 wolves in Canada. 3-ER-314.

As illustrated by the below graph (3-ER-436), gray wolf populations have greatly exceeded the Service's demographic recovery goals in both the Great Lakes and Northern Rocky Mountain regions. 3-ER-436–46; 3-ER-449–51. Gray wolves also continue to disperse throughout those regions and beyond. 3-ER-436–46; 3-ER-449–51.

# Changes in Distribution and Abundance Since Listing



**Figure 2.** Minimum number of gray wolves (*Canis lupus*) counted in the lower 48 United States, 1979-2018. Does not include Mexican wolves. Great Lakes metapopulation counts are only given for years when data were available for all states in that region. Minimum counts for the entire Western United States metapopulation are not available after 2015 due to changes in state monitoring strategies (see text for more details).

### 3.  The Service's previous regulatory efforts and related litigation

Recognizing the biological recovery of gray wolves, the Service embarked on a series of rulemakings to carry out its responsibility under the ESA to review the lists of endangered and threatened species and determine whether any species should be delisted, uplisted, or downlisted based on the Act's five factors.  16 U.S.C. § 1533(c).  But those efforts have been repeatedly challenged in court.  3-ER-306–07 (table listing regulatory actions and litigation history).  And states have

14

sometimes made controversial management decisions after the Service's regulatory actions, changing the factual landscape and heightening public disagreement. There are too many past rules and related cases to discuss them all here. What is relevant is that, by 2019, decades of regulatory and judicial actions had left a patchwork of protections applied to gray wolves in the lower 48 states. 3-ER-306–08.

In the Northern Rocky Mountain region, the Service designated the wolves in that area as a DPS in 2009 and delisted those wolves, except in Wyoming, where the Service determined that state regulatory mechanisms were inadequate to ameliorate the threat of human-caused mortality. 74 Fed. Reg. 15123 (Apr. 2, 2009). After a court invalidated that rule, Congress instructed the Service to republish the 2009 rule and shielded it from judicial review. Pub. L. No. 112-10, 125 Stat. 38, 150 (Apr. 15, 2011); 76 Fed. Reg. 25590 (May 5, 2011) (reinstating the 2009 rule). Three years later, after Wyoming improved its regulatory mechanisms, the Service delisted wolves in Wyoming too. 77 Fed. Reg. 55530 (Sept. 10, 2012). The D.C. Circuit upheld that rule, reversing a lower court decision. *Defs. of Wildlife v. Zinke*, 849 F.3d 1077 (D.C. Cir. 2017); 82 Fed. Reg. 20284 (May 1, 2017) (reinstating the 2012 rule). Since then, wolves in the recovered Northern Rocky Mountain region (Idaho, Montana, Wyoming, Eastern Oregon, Eastern Washington, and North-Central Utah) are not listed as threatened or endangered under the ESA. 3-ER-308.

In the Great Lakes region, the Service revised the gray wolf listings by identifying a Western Great Lakes DPS, determining that those wolves were recovered, and delisting that DPS in 2011. 76 Fed. Reg. 81666 (Dec. 28, 2011). The rule left the remaining listed wolves outside the Great Lakes protected as endangered. But the D.C. Circuit affirmed a district court decision invalidating that rule in *Humane Society of the United States v. Zinke*, 865 F.3d 585, 600–03 (D.C. Cir. 2017). The D.C. Circuit confirmed that the Service had the authority under the ESA to recognize a recovered segment of a listed species as a DPS and to delist it. *Id.* at 597–600. But when the Service does so, the Court held it must also address whether the rest of the listed species, if endangered or threatened, remains protectable under the Act. *Id.* at 602. Because the Service's Great Lakes DPS rule did not explain whether the rest of the listed wolves qualified as a species under the Act or whether they were endangered or threatened, the Court held that the rule was unlawful and affirmed the district court's vacatur of the rule. *Id.* at 600–03; *accord Crow Indian Tribe v. United States*, 965 F.3d 662, 677 (9th Cir. 2020) (holding that when the Service delists a DPS, it need only evaluate whether the rest of the species remains a protectable entity so that no de facto delisting occurs).

### 4. The 2020 delisting rule

By 2019, gray wolves were listed in two entities in the lower 48 states: (1) threatened in Minnesota and (2) endangered in the rest of the United States except in the Northern Rocky Mountain and Southwest regions (44 states in total):



**Figure 1:** Current legal status of *C. lupus* under the Act. Northern Rocky Mountains DPS and Mexican Wolf Non-Essential Experimental Population are not part of the currently listed entities. All map lines are approximations; see 50 CFR 17.11 and 17.84(k) for exact boundaries.

3-ER-308 (enhanced for clarity). After an extensive evaluation of the best available science and commercial data, as well as independent peer reviews and public comments received during a 120-day public comment period, the Service issued a 117-page Rule removing those gray wolf entities from the list of endangered and threatened species. 3-ER-304–421.

Given the unique listing history, the Service's previous rules, and the intervening court decisions, the Service adopted a "conservative approach" in its Rule. 3-ER-310. Instead of looking at portions of the listed entities as DPSs or taxonomic units, as it had done previously (*see supra* pp. 14–16), the Service focused on the entities as they were listed—threatened in Minnesota and endangered in 44 states. 3-ER-310.

The Service first concluded that neither listed entity constituted a protectable "species" as defined by Congress. 3-ER-309–10. Although in the Service's view, that conclusion could provide an "independent basis for delisting," 3-ER-310, it declined to "remov[e] the listed entities solely because they do not meet the statutory definition of a 'species.'" 3-ER-310. Instead, the Service exercised its discretion to "consider whether any populations of gray wolves covered by the listed entities meet the definition of a threatened species or endangered species" before delisting the wolves. 3-ER-310.

Considering the unique listing history, the Service analyzed gray wolves in three different configurations: (1) each listed entity separately; (2) the two listed entities combined; and (3) a single gray wolf entity including all gray wolves in the lower 48 states (except for the Mexican wolf subspecies). 3-ER-310–11. The Service extensively analyzed these configurations and concluded that none were endangered or threatened in all or a significant portion of their range under any of

the five factors governing listing determinations.  16 U.S.C. § 1533(a)(1).  The

Service thus delisted the current wolf entities and did not list any new or different

wolf entity.[3]

### C.    Proceedings below

Environmental organizations challenged the Rule in three related cases in the

Northern District of California.  1-ER-5.  The State of Utah, Safari Club, and

National Rifle Association intervened as defendants.[4]  1-ER-5.

---

[3] As discussed above (pp. 14–16), the Service's decisions about gray wolves
are often controversial and subject to litigation.  On February 7, 2024, the Service
denied petitions to relist the Northern Rocky Mountain wolves, concluding that
listing those wolves or a larger DPS of wolves in the Western United States is not
warranted.  89 Fed. Reg. 8391 (Feb. 7, 2024).  That finding, which did not change
the listing status of wolves, is currently in litigation.  *Ctr. for Biological Diversity v.
U.S. Fish & Wildlife Serv.*, No. 9:24-cv-86 (D. Mont.).  The Service also committed
in other litigation "to develop and post on its website a draft recovery plan for listed
gray wolves, unless the Service finds that such a plan will not promote the
conservation of the species and posts the finding on its website."  ECF No. 25-1,
Stipulated Settlement Agreement, *Ctr. for Biological Diversity v. Haaland*, No.
1:22-cv-03588 (D.D.C. Dec. 13, 2023).  These actions and related cases are not
relevant to this appeal, but highlight the difficulties faced by the Service every time
it acts regarding gray wolves.  *See also* Press Release, U.S. Fish & Wildlife, *National
Dialogue Initiated on Working Landscapes and Gray Wolves* (Dec. 13, 2023),
https://www.fws.gov/press-release/2023-12/national-dialogue-initiated-working-
landscapes-and-gray-wolves.

[4] The district court denied motions to intervene by various sportsmen and
agricultural groups.  The agricultural groups appealed, and this Court reversed,
allowing them to participate as intervenors in this appeal.  Order, *Defs. of Wildlife v.
U.S. Fish & Wildlife Serv.*, No. 21-16382 (9th Cir. Aug. 24, 2022).

The district court granted summary judgment for Plaintiffs on most of their claims and vacated and remanded the Rule. 1-ER-10–29. Relevant to this appeal, the court identified several purported errors with the Service's scientific determination that the listed gray wolves are no longer endangered or threatened. 1-ER-13–29.

First, the court concluded that the Service did not adequately consider threats to lone and dispersing wolves outside the two metapopulations. 1-ER-13–14. Second, in the court's view, the Service overlooked science showing that West Coast wolves are distinct from the Northern Rocky Mountain wolves. 1-ER-14–17. Third, the court determined that the Rule's definition of "significant" was unreasonable at *Chevron* Step Two. 1-ER-17–21. Fourth, the court held that the Service did not sufficiently analyze the effects of the wolf's lost historical range. 1-ER-21–22. And finally, while the court determined that the Service reasonably concluded that existing state regulatory mechanisms were adequate to ensure protection of wolves after delisting, 1-ER-22–26, the court ruled that the Service failed to consider whether federal land management regimes also would protect the wolves. 1-ER-26.

The district court also rejected the Service's and Intervenors' threshold argument that the Rule could be independently upheld because the listed entities do not meet the ESA's definition of "species." 1-ER-10–13. It explained that it could not uphold the Rule on this basis because the Service itself expressly declined to rely

solely on its species determination. 1-ER-12–13. The Service does not challenge this holding on appeal.

## SUMMARY OF ARGUMENT

The Rule removing the gray wolf entities from the list of endangered and threatened species should be upheld. The gray wolf is one of the ESA's biggest success stories: it has made a remarkable recovery and now thrives in the continental United States in two large, expanding metapopulations that are also connected to large populations of wolves in Canada. The district court's decision faulting the Service's extensive recovery analysis fundamentally misunderstands the ESA, the relevant science, and the role of a reviewing court under the APA.

1. The district court's decision rests on its mistaken belief that the ESA requires the Service to protect individual members of a healthy species and to restore that species throughout its historical range.

a. The district court ruled that the Service should have focused more on lone dispersers and peripheral wolves in its analysis. But the record shows that the Service carefully analyzed wolves in three different configurations and concluded that none of those entities were endangered or threatened because of any of the five factors. The district court implied that the Service's analysis improperly left lone wolves and dispersers without protection. But the ESA requires the conservation

and recovery of *species*; it does not require the protection of individual animals that are part of a healthy, viable species.

b.      Similarly, the district court held that the Service erred by failing to consider threats to wolves in areas of the United States where wolf populations no longer exist.  As a practical matter, however, the Service cannot evaluate the threat of humans to wolves in places where wolves do not exist.  Besides, that type of analysis would matter only if the ESA required the Service to restore each listed species to every place it existed historically.  But the statute imposes no such obligation.  Because the Service determined based on the best available science that wolves are not endangered or threatened in their current range, even considering the loss of their historical range, the Service's analysis should be upheld.

2.      The district court also wrongly rejected the Service's analysis of which portions of the wolf's range were "significant."  The court determined that the Service's interpretation of "significant" was unreasonable because it did not provide any objective guideposts.  But the ESA does not direct the Service to use quantitative measurements.  Congress instead used the term "significant," which in this context is best read to leave the Service with flexibility to consider the best available science and specific biology of each species.  The Service's application of that standard to this case was not arbitrary or capricious.  It carefully explained that it evaluated significance based on "any reasonable definition" of the term, and provided rational,

fact-based reasons for its conclusion that the wolf is not imperiled in any significant portion of its range.

3.     Next, the district court improperly substituted its understanding of the genetic makeup of gray wolves in the Western United States for that of the Service. The Service analyzed the best available science and concluded that wolves in Washington, Oregon, and California (the West Coast wolves) were genetic descendants of the population of wolves in the Northern Rocky Mountain region. Citing to a single sentence in one of the scientific studies the Service evaluated, the district court rejected the Service's conclusion and suggested that West Coast wolves are, in fact, genetically distinct from Northern Rocky Mountain wolves. But the court misread the science and, in any event, should have respected the Service's expert judgment.

4.     The district court also erred in holding that the Service failed to consider the adequacy of existing regulatory mechanisms to protect wolves after delisting. The court credited the Service's conclusion that state regulatory mechanisms will protect wolves after delisting, once management of wolves returns to the states. Yet the court held that the Service should have said more about federal regulatory mechanisms, including that some land management plans lack specific guidelines for wolves. But under the ESA the Service is only required to examine regulatory mechanisms that will apply after delisting and determine whether those

mechanisms will be inadequate to protect the species.  Contrary to the district court's suggestion, the Service need not conclude that the mechanisms are the best or most protective.  Here, the Service appropriately examined existing state regulations, combined with existing federal regulatory mechanisms, and concluded that those regimes were adequate to protect wolves after delisting.  Nothing else is required.

## STANDARD OF REVIEW

This Court reviews the district court's summary-judgment decision de novo. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 991 (9th Cir. 2014). It conducts its "own review of the administrative record," without deference to the district court.  *Id.*

The rulemaking here is reviewed under the highly deferential standard of the APA, 5 U.S.C. § 706(2)(A).  An agency action is arbitrary and capricious only if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1050–51 (9th Cir. 2012).  Under this standard, courts are the most deferential "[w]hen the agency is making predictions, within its [area of] special expertise, at

the frontiers of science." *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003) (citation omitted).

## ARGUMENT

### I. The district court's decision rests on the incorrect assumption that the ESA requires restoration of a species throughout its historical range.

The ESA's goal is the recovery of species from the risk of extinction. 16 U.S.C. §§ 1531(b), 1532(3); *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) ("The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species, extinction . . . ."). So it makes sense that the statute and its protections apply to only species that are "in danger of extinction" or in danger of becoming so in the foreseeable future. 16 U.S.C. § 1532(6), 1532(20). Likewise, recovery under the ESA is the absence of the threat of extinction. When the Service determines, based on the best available science, that a species is no longer threatened or endangered—i.e., recovered—it will delist the species. 50 C.F.R. § 424.11(e)(2).

Congress deliberately used broad terms denoting the status of entire "species," like "endangered" and "threatened," rather than providing specific benchmarks like the presence of a species in a certain percentage of its former range or an increase in population to a certain percentage of its peak numbers. *See Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1143 (9th Cir. 2001) ("[W]ere a brightline percentage appropriate for determining when listing was necessary, Congress could simply have

included that percentage in the text of the ESA."). This allows the Service, in its expert judgment, to perform a species-by-species inquiry. *See id.* As this Court has recognized, "it simply does not make sense to assume that the loss of a predetermined percentage of habitat or range would necessarily qualify a species for listing. A species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat."[5] *Id.*

Take, for example, the American black bear. Black bears have been eradicated from many parts of their historical range, including many states. Brian K. Scheick & Walter McCown, *Geographic Distribution of American Black Bears in North America*, 25 Ursus, no. 2, 2014, at 29. Yet hundreds of thousands of black bears remain in the United States in stable and increasing populations, *see id.*, even though in some states they are subject to hunting. Listing the American black bear would not only impose unnecessary protective measures for a healthy, viable species, it would also take away limited government resources from genuinely endangered and threatened species. *Defs. of Wildlife*, 258 F.3d at 1143 n.9.

Just as a species does not qualify for listing simply because it no longer occupies all or even most of its historical range, a species may not *remain* on the list

---

[5] On the flip side, the Service has listed other species as endangered or threatened, even though they still inhabit a large part of their historical range. *E.g.*, 88 Fed. Reg. 11600 (Feb. 23, 2023) (proposed); 87 Fed. Reg. 76882 (Dec. 15, 2022).

simply because it has not repopulated everywhere it used to be. Instead, Congress directed the Service to make listing and delisting decisions based on the best available science as to five statutory factors. 16 U.S.C. § 1533(a)(1). And while the contraction and expansion of a species' range is relevant to the Service's analysis of those factors (*see infra* pp. 35–37), none mandate that a species occupy the entirety or even a certain percentage of its historical range to be considered recovered.

Despite this textual evidence that the ESA does not require restoration of a species throughout its historical range, the district court presumed that the Service could not delist the gray wolf entities until it could prove that wolves outside the core populations and current range were not at risk. This underlying assumption is evident in two of the court's conclusions: (1) that the Service did not adequately consider wolves outside the two core populations, 1-ER-13–14; and (2) that the Service did not sufficiently consider the wolf's lost historical range, 1-ER-21–22. In both instances, the district court overlooked sizeable evidence in the administrative record showing that the Service did the required analysis. Rather than credit this analysis, as the APA requires, the district court reprimanded the Service for not focusing more on lone wolves and areas without wolf populations. But those concerns go to the restoration of the wolves' historical range and whether wolves could become more widespread or abundant in the United States. They do not speak

to whether the listed entities are endangered or threatened, which is the relevant standard established by the text of the ESA.

### A. The Service carefully analyzed all listed wolves, not just segments of the entities.

As discussed above (pp. 9–16), when making listing decisions for the gray wolf, the Service must navigate a complicated background of past regulatory actions and court decisions. That context informed the Service's conservative approach in the Rule. The agency noted that its past regulatory actions had focused on portions of the listed entities as DPSs and taxonomic units. 3-ER-310. By contrast, in this Rule, the Service intentionally chose to "focus on the currently listed entities." 3-ER-310. It first analyzed the listed entities separately. 3-ER-310–13; 3-ER-406–12. It then also applied the ESA's five factors to other configurations of wolves, including the combined listed entities and "a single gray wolf entity that includes all gray wolves in the lower 48 state[s] and Mexico except for the Mexican wolf [subspecies]." 3-ER-310; 3-ER-412–15; 3-ER-415–19.

The Service undertook this extensive analysis because of "the unique listing history of the gray wolf." 3-ER-310. As the Service recognized, the two listed entities were "largely vestiges of a 42-year-old action" that pre-dated the Service's current DPS policy. 3-ER-310. Moreover, the original listing had been modified by other rules, including the separate Mexican wolf subspecies listing and the Northern Rocky Mountain delisting rule that Congress reinstated. *See supra* pp. 9–16; 3-ER-

308–11.  Given that background and the intervening court decisions in *Crow Tribe* and *Humane Society*, the Service was careful to ensure that it addressed the status of any reasonable configuration of the wolf entities in the lower 48 states, whether listed or not.  3-ER-310–13.

Ultimately, the Service concluded that none of the wolf configurations were endangered or threatened, and therefore delisted the currently listed gray wolf entities.  Key to its conclusion was that wolves now exist in the lower 48 states in two large metapopulations that are stable or growing.  3-ER-416.  These populations are broadly distributed and contain high levels of genetic diversity.  3-ER-416.  They can also withstand many threats, including higher levels of mortality, because wolves can disperse long distances, recolonize, and quickly reproduce.  3-ER-416.

These two populations are also connected to large populations of wolves in Canada.  3-ER-416.  As the Service recognized, "[p]opulations that are connected to and interact with other populations of the same species (metapopulations) are widely recognized as being more secure over the long term than are several isolated populations that contain the same total number of packs and individuals."  3-ER-408.

Based on these thriving metapopulations, the Service concluded that wolves outside those areas "are not necessary for the recovered status" of gray wolves in any of the three configurations.  3-ER-409; 3-ER-412–13; 3-ER-417.  Of course, the

agency recognized that these individual wolves add value and further enhance the viability of the species. But the Service ultimately determined that "the[se other wolves] are not necessary in order to conserve wolves to the point that they no longer meet the definitions of endangered or threatened." 3-ER-409; 3-ER-412–13; 3-ER-417.

> ### 1. The Service's biological decision to focus on core metapopulations does not mean it overlooked other gray wolves.

The district court criticized the Service's conclusion and described its analysis of threats to wolves outside the metapopulations as "dismiss[ive]" and "cursory." 1-ER-14. Not so. Even though the Service recognized the biological importance of metapopulations, the Service still carefully acknowledged lone and dispersing wolves in its threats analysis. For instance, it recognized that gray wolves in the periphery of occupied range could be at higher risk of inbreeding "as wolves continue to disperse and recolonize areas within their historical range." 3-ER-347. But it determined that these effects "would not likely be widespread or impact the larger population." 3-ER-347. Thus, this increased risk "is not likely to be of such a magnitude . . . to pose a significant threat to the species." 3-ER-347.

Likewise, the Service acknowledged that the risk of human-caused mortality "is not uniform" and "tends to be highest for dispersing animals" and wolves "on the peripheries of occupied wolf range." 3-ER-320; 3-ER-414; 3-ER-418. And

although the Service expected mortality to rise slightly post-delisting, it concluded that mortality would be adequately regulated and would not threaten the species overall. 3-ER-338–39. The Service explained that the heightened risk to peripheral wolves was not a concern for the species because those wolves descended from the core populations, are lone dispersers, or have few (if any) breeding pairs. 3-ER-417.

The Service also addressed the small number of wolves in Colorado, and specifically concluded that human-caused mortality did not and would not threaten those wolves or their ability to recolonize and expand. 3-ER-338; *see also* 3-ER-373 (noting that there is no empirical evidence indicating that increased human-caused mortality would affect or has affected peripheral wolves).

The district court overlooked this thorough analysis. Instead of crediting the agency's scientific determination about the species as a whole, the court blamed the Service for not placing greater emphasis on threats to individual wolves. 1-ER-14. It is not the court's job, however, to weigh that evidence. *See Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (a court must affirm agency action "if a reasonable basis exists for its decision"). Besides, any evidence that peripheral or lone wolves are at greater risk is not evidence that the species overall, in any reasonable configuration, is imperiled.

The court's conclusion also misunderstands the science of species vulnerability. All species are affected to some degree by threats like disease,

predation, and human-caused mortality. So putting a spotlight on the most vulnerable *individuals* of a species will always lead to the conclusion that those *individuals* are at risk. But that does not mean that every species is in danger of extinction throughout all or a significant portion of its range now or in the foreseeable future. The ESA directs the Service to list a species, and keep it listed, only if the *very existence* of that species is endangered or threatened by any of the five statutory factors. 16 U.S.C. § 1533(a)(1), (c). The Act is not meant to protect individual members of a species that is not threatened or endangered.

## 2. The Service's approach is consistent with *Humane Society*.

In the district court's view, the Service's analysis also conflicted with *Humane Society* because it "fail[ed] to address the status of wolves outside core populations." 1-ER-14. But the court misinterpreted that case. *Humane Society* addressed a previous rule that designated and delisted a *segment* of the listed wolves without considering whether the remaining listed wolves were still protectable as a "species" under the ESA. 865 F.3d at 602; *see supra* p. 16 (providing a summary of the case). The D.C. Circuit explained that because the Service did not examine the status of the remaining remnant wolves, it could lead to a "de facto delisting of already-listed species" by "sidestepping the process Congress has plainly prescribed for delisting." *Humane Soc'y*, 865 F.3d at 602 (cleaned up); *accord Crow Tribe*, 965 F.3d at 678.

By contrast, the Service here examined all listed gray wolf entities, leaving no remnant with uncertain status. The agency was upfront that it was delisting the entirety of both listed entities, not just a segment. But before it did so, the Service exhaustively analyzed the listed wolves in three configurations under the ESA's five statutory factors. 3-ER-405–19. And for each configuration, the Service concluded that none of the factors indicated that the wolves were threatened or endangered. 3-ER-405–19. In other words, there was nothing "de facto" about this delisting. The Service did exactly what *Humane Society*—and this Court in *Crow Tribe*—instructed it to do: it considered all listed gray wolf entities and delisted them only after considering the ESA's "specifically enumerated requirements for delisting." *Humane Society*, 865 F.3d at 602; *accord Crow Tribe*, 965 F.3d at 678.

The district court nonetheless suggested that *Humane Society* requires the Service to keep a species on the list whenever some individual members of that species are susceptible to threats. *See* 1-ER-14. There is no basis for that expansive reading. *Humane Society* addressed a narrow question: could the Service designate and delist a segment of a listed species? The D.C. Circuit said yes, but held that when the Service does so, it must determine that the remnant of the listed species "*if still endangered or threatened*" remains protectable. 865 F.3d at 602 (emphasis added). The Service did not leave a listed remnant here. And, in any event, the Service carefully applied the statutory five factors to the listed entities as well as to

all gray wolves in the lower 48 states (minus the Mexican wolf subspecies) and concluded that none were endangered or threatened. Thus, the Rule left no remnant implicating the concerns raised in *Humane Society* or *Crow Tribe*.

If the district court's interpretation of *Humane Society* were correct, it would be impossible for the Service to ever delist gray wolves. A healthy, recovered population of gray wolves will often be growing. This means that there will often be dispersers or other individual animals on and outside the edges of existing populations. If those peripheral individuals are always considered a "remnant" that must survive independently outside of the larger metapopulations, as alluded to by the district court, then gray wolves cannot be delisted until no population can expand further. But as discussed above (pp. 25–28), and reaffirmed in *Humane Society*, 865 F.3d at 606, the ESA does not require that federal protection of a species continue unless and until it is repopulated in all suitable habitat.

**B.     The Service appropriately considered lost historical range.**

The ESA tasks the Service with determining whether a species "is in danger of extinction throughout all or a significant portion of its range," or likely to become so in the foreseeable future, based on the five factors. 16 U.S.C. §§ 1532(6), 1532(20), 1533(a)(1). No party has disputed that the term "range" means "current,"

not historical, range.  ECF 74, Pls' S.J. Mot. at 28–30 (July 16, 2021); ECF 129, Pls'

Reply at 19 (Sept. 15, 2021).[6]

As the Service has recognized, the present-tense phrase "is in danger" is best

read as referring to presently existing—not past—conditions.  79 Fed. Reg. 37578,

37583–84 (July 1, 2014) (hereinafter "SPR Policy"); *cf. Bonnichsen v. United States*,

367 F.3d 864, 875 (9th Cir. 2004) (interpreting the statutory phrase "a tribe, people,

or culture *that is* indigenous" to mean "*presently existing* Indian tribes").  "[T]o say

a species 'is in danger' in an area where it no longer exists—i.e., in its historical

range where it has been extirpated—is inconsistent with common usage."  *SPR*

*Policy*, 79 Fed. Reg. at 37583; *see also Humane Soc'y*, 865 F.3d at 605 ("[F]ocusing

on the species' survival in the range it currently occupies is consonant with the

purposes of the [ESA], because the threats that a species confronts where it currently

lives often affect its continued survival the most and thus bear influentially on

whether it should be listed.").

Not only is the Service's interpretation of "range" the most natural reading of

the statute's text, this Court has upheld it.  *Ctr. for Biological Diversity v. Zinke*, 900

F.3d 1053, 1066–67 (9th Cir. 2018).  That holding is entitled to statutory stare

decisis, even though it relied on the then-prevailing framework of *Chevron, U.S.A.,*

---

[6] Nor did the district court.  In fact, the court recognized that the Service's
understanding of range was lawful.  1-ER-21.

*Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837 (1984). *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) ("[W]e do not call into question prior cases that relied on the *Chevron* framework."); *see infra* pp. 41–45 (discussing *Loper Bright*). Overruling this precedent would require action from this Court sitting en banc because "to say a precedent relied on *Chevron* is, at best, 'just an argument that the precedent was wrongly decided.'" *Loper Bright*, 144 S. Ct. at 2273 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014)).

It is therefore settled for present purposes that lost historical range is not a separate inquiry or a stand-alone reason for listing. Of course, the Service must still consider the historical range of a species, including any lost historical range, when it evaluates the five factors. *Ctr. for Biological Diversity*, 900 F.3d 1064 ("FWS must at least explain why the lost and threatened portions of a species' range are insignificant before disregarding historical range"); *Humane Soc'y*, 865 F.3d at 606 (the Service "needs to consider the scope of the species' historical range, and the impact that material contraction or relocation might indicate for survival within a currently constricted or confined range"). Indeed, "evaluating the effects of lost historical range on the viability of the species is an important component of evaluating the current status of the species." *SPR Policy*, 79 Fed. Reg. at 37584.

Range contraction may be relevant to the Service's five-factor analysis in several ways. Most typically, the effects of range contraction may increase a

species' vulnerability to various threats. *Id.*; *see* 3-ER-318. This is true when a species requires a broader range than it currently occupies for long-term viability—either because of specific biological needs or because a broader range would insulate the species against other threats. For instance, "a species with a reduced range is at greater risk of all or most of its populations being affected by a catastrophic event such as a hurricane or fire." *SPR Policy*, 79 Fed. Reg. at 37584.

In some cases, lost historical range may also be relevant as evidence of the effects of an ongoing or future threat. *Id.* For example, if an invasive predator species eradicated another species from its historical range, the Service would look at whether that invasive species is spreading (or likely to spread) to the native species' current range and, if so, whether that spread is still a threat. By contrast, if range contraction is not ongoing because the threats that caused that original contraction have subsided, then past range contraction may not shed much light on the current or future status of a species.

The only question for this Court is whether the Service rationally took the gray wolf's historical range into account when applying the five factors. It did. Although wolves have lost substantial historical range in the lower 48 states, 3-ER-318, the Service rationally concluded that the listed entities do not presently meet the definition of a threatened or endangered species despite this range contraction. 3-ER-410–19.

*First*, the Service explained that "human-caused mortality" was "the main factor responsible for the decline of gray wolves." 3-ER-320. Likewise, "[a]n active eradication program [wa]s the *sole* reason that wolves were extirpated from much of their historical range in the United States." 3-ER-320 (emphasis added). But those eradication programs have ended, and human-caused mortality of wolves is highly regulated throughout most of its suitable habitat (and, as the Service determined at the time of the Rule, human-caused mortality would remain adequately regulated post-delisting). 3-ER-320–39; 3-ER-347–69.

*Second*, the Service considered the ongoing effects of that range contraction in its analysis. For instance, the Service noted that a contracted range slightly impaired genetic diversity. 3-ER-346 (noting study examining historical genetic diversity and concluding that a significant amount had likely been lost). And the agency recognized that the decreased number of wolves made the overall species more vulnerable to threats. 3-ER-318. But ultimately, the Service concluded that the causes of the contraction and its effects "have been ameliorated or reduced" and do not threaten the viability of the species. 3-ER-412; 3-ER-415; 3-ER-419.

For example, the Service observed that the risk of human-caused mortality "tends to be highest for dispersing [wolves]" and for wolves at the outside peripheries of the current range, 3-ER-320, but it determined that human-caused mortality did not imperil the species because of the thriving metapopulations and the

ability of wolves to reproduce, disperse, and find vacant habitat. 3-ER-322. Based on evidence of wolves post-delisting in the Northern Rocky Mountain region, the Service concluded that wolves would continue to disperse from the core populations, moving out and recolonizing vacant suitable habitat in the West. 3-ER-385; 3-ER-320–39.

The district court did not acknowledge any of this analysis. Instead, the court faulted the Service for failing to analyze the threat of human-caused mortality in areas *outside* the wolf's current range in the United States. 1-ER-22. But, putting aside the question how to even get the relevant data, it makes no sense to require the Service to directly analyze the threat humans pose to wolves in areas where wolves do not exist. In short, it is pointless to separately consider whether the wolves are "in danger of extinction" in areas where there are no wolves.

The district court's decision effectively changes "current range" to "historical range," by requiring the Service to analyze threats to wolves in all areas of its historical range in the United States. 1-ER-22. But, again, the ESA does not require the Service to restore wolves to all areas where they used to be. Particularly in this case, such a requirement is impossible to meet, given how widespread wolves used to be and the significant development in many of those areas. *See, e.g.*, 3-ER-339 ("While it is also possible for wolves to recolonize other non-forested portions of their historical range in the Midwest, relatively high densities of livestock and

limited hiding cover for wolves (forests) in this region are likely reasons that wolves have failed to recolonize in this area."). The practical consequence of the district court's holding is that the gray wolf can never be delisted.

## II. The district court erred in rejecting the Rule's evaluation of "significant portion of its range."

In analyzing whether gray wolves are endangered or threatened throughout a significant portion of their range, the Service must consider whether portions of the wolf's current range are "significant." 16 U.S.C. § 1532(6), (20). The Service's 2014 *SPR Policy* set forth a definition of "significant," 79 Fed. Reg. at 37583, which was challenged and overturned.[7] Given that litigation, the Service explained in its Proposed Rule that it had "not yet determined the best way to interpret 'significant,'" but it applied the term "in a way that is consistent with . . . relevant case law." 3-ER-530. The Service then explained that it looked for portions "that could be significant under any reasonable definition of 'significant.'" 3-ER-530. For the gray wolf, that meant that the Service examined "any portions that may be biologically important in terms of the resiliency, redundancy, or representation of the species." 3-ER-530. The Service made clear that this approach was "limited to this analysis, and is not precedent for any future determinations." 3-ER-530.

---

[7] *Desert Survivors v. U.S. Dep't of Interior*, 321 F. Supp. 3d 1011 (N.D. Cal. 2018); *Ctr. for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946, 956 (D. Ariz. 2017).

In the Rule, the Service again stated that it "evaluated whether any portions [of the wolf's range] could be considered significant under any reasonable definition of 'significant.'" 3-ER-404. It thus "asked whether any portions of the range may be biologically meaningful in terms of the resiliency, redundancy, or representation of the entity being evaluated." 3-ER-380; 3-ER-404.

In the district court, the Service argued that the Rule's definition of "significant" should receive deference under the then-prevailing *Chevron* framework. ECF No 107, Fed. S.J. Mot. at 33 (August 20, 2021). The district court agreed that the *Chevron* framework applied but held that the Service's interpretation was unreasonable because it "lacks objective guideposts or factors against which the Court can judge the exercise of discretion." 1-ER-20.

On June 18, 2024, the Supreme Court issued *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), which overruled the *Chevron* deference framework. But putting *Chevron* aside, the Rule should be upheld.

A. **The ESA delegates to the Service the task of judging "significant" on a species-by-species basis.**

While the judiciary's role under *Loper Bright* is to independently determine the best interpretation of a statute when called on, it does not follow that courts must always themselves definitively resolve the meaning of a statutory term or phrase. *Cf. Pac. Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*, ---- F.4th ----, 2024 WL 3908398, *6 (D.C. Cir. Aug. 23, 2024). Here, there is no need to decide what

41

possible interpretation of "significant" may be best, because the Service provided a rational explanation for its action under any reasonable candidate for best interpretation.[8]

Moreover, the best reading of the statute is that it delegates to the Service the scientific task of assessing whether a particular portion of an individual species' range is "significant," within the term's broad outer boundaries. Congress directed that "*[t]he Secretary shall* by regulation . . . *determine* whether any species is an endangered species or a threatened species because of any of the [five] factors," 16 U.S.C. § 1533(a)(1), and Congress broadly defined "endangered" as "any species which is in danger of extinction throughout all or a significant portion of its range," *id.* § 1532(6). Read together, that text "expressly delegate[s]" to the Service the task of judging significance for each species. *Loper Bright*, 144 S. Ct. at 2263 (citation omitted).

The role of the Court is limited to "recognizing" the delegation, "fixing the boundaries of the delegated authority," and "ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.* (cleaned up). Here, the

_____

[8] For the same reason, the Court need not decide whether the Rule's proffered definition of "significant"—portions of the range that contribute meaningfully to the resiliency, redundancy, or representation of the gray wolf entity—is the best interpretation of that term. The Service did not adopt an all-purpose definition of "significant" in the Rule, and the agency is considering options for an interpretation that could be broadly applied to all species.

outer boundaries are broad, because the word "significant" itself "leaves [the Service] with flexibility." *Id.* (citation omitted); *see Kisor v. Wilkie*, 588 U.S. 558, 632 (2019) (Kavanaugh, J., concurring in the judgment) ("'[O]pen-ended terms' like 'reasonable,' 'appropriate,' 'feasible' and 'practicable'" "afford agencies broad policy discretion").   Under the ordinary meaning of the term at the time of enactment, *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020), "significant" refers to more than geographical size:  it means sufficiently great or important to be worthy of attention; noteworthy; consequential; influential.  *Oxford English Dictionary* 37 (1978) ("full of meaning or import;" "important, notable"); *Webster's Third New International Dictionary* 2116 (1976) ("having meaning;" "having or likely to have influence or effect: deserving to be considered;" "important, weighty, notable"). This open-ended term thus hinges on its context:  Congress's direction that the Service make an expert biological determination about whether a particular species is endangered throughout all or a significant portion of its range.  *Loper Bright*, 144 S. Ct. at 2263 (words like "appropriate" and "reasonable" leave agencies with flexibility).

Indeed, as this Court has recognized, Congress deliberately used the broad phrase "significant portion of its range" to "allow the Secretary more flexibility in her approach to wildlife management."  *Defs. of Wildlife*, 258 F.3d at 1144.  As a result, "[t]he Secretary necessarily has a wide degree of discretion," *id.* at 1145, in

determining what is "significant" for each species, based on the best available science relevant to that particular species.

Because the ESA "delegates authority to an agency," "courts must respect the delegation, while ensuring that the agency acts within it." *Loper Bright*, 144 S. Ct. at 2273. A court may not decide for itself what portions of a species' range are significant. *See River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). Congress instead entrusted those decisions to the Service, subject to judicial review only to ensure against action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see generally Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376–77 (1989) (agency determination that new information was not "significant" enough to warrant supplemental environmental analysis was not a legal question about the meaning of significance but instead involved "primarily issues of fact" that "require[d] a high level of technical expertise" (citation omitted)). That allocation of authority is "altogether fitting," because courts lack the "scientific" and "technological" expertise needed for "coping with issues of this order." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 428 (2011).

As explained below, the Service's application of the term "significant" was sound and should be sustained under the arbitrary-and-capricious standard of review. If the Court disagrees, it should remand for the Service to reinterpret the term in the

first instance because its application to gray wolves may "rest[] on factual premises within the agency's expertise." *Loper Bright*, 144 S. Ct. at 2267 (cleaned up).

**B.** **The Service's application of "significant" was not arbitrary or capricious.**

As discussed above (p. 24), the APA's arbitrary-and-capricious standard of review is narrow and requires only that the agency's exercise of discretion within the statutory framework "be reasonable and reasonably explained." *Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*, 73 F.4th 657, 668 (9th Cir. 2023) (citation omitted). That standard is satisfied here.

For each configuration of gray wolves, the Service asked whether those entities were in danger of extinction or likely to become so in the foreseeable future throughout all their range. 3-ER-406 (Minnesota entity); 3-ER-408–09 (44-state entity); 3-ER-412–14 (combined listed entity); 3-ER-415–18 (lower 48-state entity). After answering "no" to that question, the Service evaluated whether there were any significant portions of each configuration's range where wolves may be in danger of extinction or likely to become so in the foreseeable future. 3-ER-406. The Service ultimately determined that none of the configurations showed that wolves were endangered or threatened in any significant portions of their range. 3-ER-407–08 (Minnesota entity); 3-ER-410–11 (44-state entity); 3-ER-414–15 (combined listed entity); 3-ER-418–19 (lower 48-state entity).

Specifically, the Service identified portions of each entity's range where gray wolves face greater threats and determined that none of those portions were significant. *E.g.*, 3-ER-418–19. For example, the Service acknowledged that portions peripheral to the Great Lakes metapopulation contained a few wolves that may be at greater risk, but the agency determined that wolves in those portions were not significant to any configuration of wolves. 3-ER-408; 3-ER-411; 3-ER-418. The Service explained that those portions were not meaningful to the resiliency or redundancy of the entities because they contained few wolves or few breeding pairs. 3-ER-408; 3-ER-411; 3-ER-418. Those portions also do not contribute to the representation of the species, because they descended from the metapopulation or, in the case of wolves on Isle Royale, are genetically isolated. 3-ER-408; 3-ER-411; 3-ER-418.

Likewise, the Service determined that portions peripheral to the Northern Rocky Mountain metapopulation were not biologically significant in part because they contained "extremely small numbers" and few breeding pairs. 3-ER-411; 3-ER-415; 3-ER-418. And because these wolves represent the expanding edge of the stable Northern Rocky Mountain population, the Service determined that the small numbers of wolves "do not contribute meaningfully to the ability of any population to withstand stochastic events," or to the entity's "ability to withstand catastrophic events." 3-ER-411; 3-ER-415. These decisions—which rested on many pages of

analysis in the Rule itself and hundreds of pages of analysis elsewhere in the administrative record—were reasonable and reasonably explained. *See Lotus Vaping*, 73 F.4th at 668.

The district court nonetheless faulted the Service's analysis for two reasons: (1) it did not provide "objective guideposts" by which the district court could assess the agency's analysis, 1-ER-20, and (2) in the court's view, the Service did not offer enough explanation of its standard, 1-ER-20–21. Neither criticism establishes that the Service's analysis was unreasonable or otherwise arbitrary and capricious.

*First*, the ESA does not require the Service to establish objective guideposts for determining what portions of a species' range are significant. If such a bright-line approach were what Congress intended, it could have either established one in the statute or required the Service to establish one. *See City of Arlington v. Fed. Commc'ns Comm'n*, 569 U.S. 290, 296 (2013) ("Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion."); *Trump v. Hawaii*, 585 U.S. 667, 692 (2018) ("When Congress wishes to condition an exercise of executive authority on the President's finding of an exigency or crisis, it knows how to say just that."). Instead, Congress used the open-ended term "significant," recognizing that factors like "the percentage of habitat loss that will render a species in danger of extinction or threatened with

extinction" will depend on the particular species and the interplay of other factors. *Defs. of Wildlife*, 258 F.3d at 1143; *see supra* pp. 41–45.

This Court has rejected similar attempts to impose quantifiable, bright-line standards—which the governing statute does not require—as a measuring stick for agency action. For example, this Court reversed a district court's conclusion that it could not adequately assess an agency's qualitative analysis, including terms like "low" or "very low," without a quantitative standard. *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1091 (9th Cir. 2005). In reversing, this Court noted that the governing statute did not require the agency to quantify its assessment, *id.* at 1097, and it reiterated that "courts should not upset agency decisions, even those announced with 'less than ideal clarity,' if 'the agency's path may reasonably be discerned," *id.* (quoting *Alaska Dep't of Env't Conservation v. Env't Prot. Agency*, 540 U.S. 461, 496 (2004)).

Similarly, this Court rejected the argument that the National Marine Fisheries Service needed to adopt a quantitative or objective standard for determining "significant" under the Marine Mammal Protection Act, 16 U.S.C. § 1389(b)(1). *Humane Soc'y of the U.S. v. Pritzker*, 548 F. App'x 355, 358 (9th Cir. 2013). As non-scientists, courts should decline to create or impose bright-line rules on expert agencies as a way to interrogate an agency's scientific determination under purposefully broad statutory language. *See The Lands Council v. McNair*, 537 F.3d

981, 993–94 (9th Cir. 2008), *overruled in part on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008).

Nor do courts require objective guideposts to determine whether an agency has acted arbitrarily or capriciously under the APA. The district court underestimated its ability to conduct a proper APA review—reading the statute and the agency's decision and discerning whether the agency applied the relevant factors and satisfactorily explained its conclusions. *Lotus Vaping*, 73 F.4th at 668. In fact, other courts have judged the Service's listing and delisting determinations under the same understanding of "significant" as in this Rule without requiring an objective threshold. *See, e.g.*, *Defs. of Wildlife*, 849 F.3d at 1093 ("The Service has offered ample rationale for determining that the predator area was never 'envisioned to *meaningfully contribute* to wolf recovery in the region' and is thus not a 'significant portion of its range'" (emphasis added)); *W. Watersheds Project v. Ashe*, 948 F. Supp. 2d 1166, 1184–89 (D. Idaho 2013) (upholding significant-portion-of-its-range analysis that similarly evaluated whether a portion of the range contributed meaningfully to the representation, resiliency, or redundancy of the species). There is no reason to impose a new, atextual requirement here. *Cf. Lands Council*, 537 F.3d at 993 (courts may not impose procedural requirements not explicitly enumerated in the relevant statute).

*Second*, the Service adequately explained both its understanding of significance and its application of that standard in the Rule. To start, the Service did not create the concept of "resiliency, redundancy, or representation" ("the three Rs") in this Rule. That concept is based on peer-reviewed scientific literature, and the Service has applied the same or similar principles in other listing determinations. 3-ER-568–70. Nor did the Service merely repeat the phrase without explaining what it meant. On a broad level, the Service explained that "[t]o sustain populations over time, a species must have a sufficient number and distribution of healthy populations to withstand annual variation in its environment (resiliency), novel changes in its biological and physical environment (representation), and catastrophes (redundancy)." 3-ER-406 (citing 3-ER-587; 3-ER-590; 3-ER-568). And specific to this Rule, the Service elaborated that the gray wolf recovery criteria align with the "conservation biology principles of representation (conserving the adaptive diversity of a taxon), resiliency (ability to withstand demographic and environmental variation), and redundancy (sufficient populations to provide a margin of safety)." 3-ER-317.

The Service then reasonably explained how it applied those concepts. In evaluating resiliency, for example, the Service observed that wolves quickly reproduce and have adequate genetic diversity. 3-ER-412 ("Those factors provide resiliency in the face of stochastic variability (annual environmental fluctuations,

periodic disturbances, and impacts of anthropogenic stressors).").  The Service also defined "representation" as "the ability of a species to adapt to changing environmental conditions over time," 3-ER-380, and explained that the "[l]ife-history characteristics of the wolf, including high dispersal capability and adaptability, along with the high genetic diversity . . . provides sufficient adaptive capacity such that their long-term survival is assured." 3-ER-412.  For redundancy, the Service evaluated the number of wolves in the portion of the range and asked whether, without that portion, catastrophic events would impact the long-term survival of the species.  3-ER-411.

Despite this analysis, the district court questioned the Service's conclusion that portions of the wolf's peripheral range are not significant because they do not meaningfully contribute to the representation, resiliency, or redundancy of the listed 44-state entity.  1-ER-20–21.  In the court's view, this conclusion conflicted with the Service's recognition that peripheral wolves in the central Rocky Mountains and West Coast states could still add to the resiliency, redundancy, and representation of the species.  1-ER-21.

The court misunderstood the Service's analysis.  Although the Service recognized that these expanding portions of the range contribute to the viability of the species overall, it also determined that wolves in those portions were not biologically meaningful to any of the entities' resiliency, redundancy, or

representation. 3-ER-410–19. For the West Coast, the Service concluded that those portions were not significant to the listed 44-state entity under "any reasonable definition" of the term because there were few wolves in those areas and they descended from the recovered Northern Rocky Mountain metapopulation. 3-ER-411. And portions peripheral to the Great Lakes population that contain lone dispersing wolves were also not significant because those wolves do not contribute to the overall demographic or genetic diversity of the population, and they are not genetically or ecologically unique. 3-ER-410. As discussed above (pp. 45–47), those determinations are rational, adequately explained, and well within the bounds of the Service's mandate to determine which species are threatened or endangered. To conclude otherwise would effectively penalize the Service for ensuring the species' success beyond what is required for recovery under the ESA.

## III. The district court improperly substituted its understanding of the genetics of Western wolves for that of the Service.

On issues of fact, a reviewing court may not "substitute its judgment for that of the agency." *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 583 (9th Cir. 2016). A court also must "be at its most deferential" when reviewing scientific determinations within the agency's area of expertise. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (citation omitted); *accord Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009) ("Where scientific and technical expertise is necessarily involved . . . a reviewing court must be highly

deferential to the judgment of the agency." (citation omitted)).  Applying these principles to a challenge to the Service's genetic analysis of gray squirrels, this Court emphasized that "we must defer to the agency's interpretation of complex scientific data." *Nw. Ecosystem All.*, 475 F.3d at 1150.

The district court acknowledged these fundamental principles, 1-ER-9, but failed to follow them.  Based on its own reading of the best available science, the court held that the Service arbitrarily concluded that wolves in the West Coast states (Washington, Oregon, and California) descended from, and are not genetically distinct from, Northern Rocky Mountain wolves.  1-ER-16–17.  The court suggested that the Service overlooked findings "indicating that [West Coast] wolves have distinct genetic traits that could distinguish them from N[orthern] R[ocky] M[ountain] wolves."  1-ER-17.  But the Service correctly interpreted those studies, and the record supports its scientific judgment that West Coast wolves are not genetically distinct from Northern Rocky Mountain wolves.

By the time of the Rule, the Service recognized that the Northern Rocky Mountain population of wolves "has continued to expand and wolves from that population have now dispersed and become established in parts of the West Coast States."  3-ER-310; 3-ER-313; 3-ER-381.  Analyzing several studies, the Service concluded that gray wolves in Oregon descended from Northern Rocky Mountain wolves and then expanded into California.  3-ER-310.  Likewise, wolves in

Washington descended from Northern Rocky Mountain wolves and Canadian wolves. 3-ER-310. Based on this and other evidence, the Service concluded that the colonizing wolves in the West Coast states are a western expansion of the Northern Rocky Mountain population, not a genetically separate population of wolves protectable as its own species (i.e., as a DPS). 3-ER-310; 3-ER-369; 3-ER-381.

The record supports this conclusion. For instance, a 2018 study by Sarah Hendricks and others concluded that all Oregon wolves contained genes from Northern Rocky Mountain dispersers. 3-ER-487 ("We find that OR individuals are of NRM ancestry only"). Wolves in California descended from these Oregon wolves and thus also contained genes from the original Northern Rocky Mountain wolves. 3-ER-474. And although wolves in Washington "have more complex ancestry," the authors ultimately concluded that "[t]he P[acific] N[orth] W[est] likely represents an admixture zone between distinct ecotypes" of coastal and inland wolves. 3-ER-487. These results demonstrate the species' ability to disperse, inhabit, breed, and survive in various habitats. 3-ER-381.

The district court faulted the Service for its conclusion about Washington wolves. 1-ER-16. It pointed to the Hendricks study's suggestion that the addition of coastal Canadian genes "may enhance adaptation to coastal habitats and enable persistence of wolf populations along the coastal areas." 3-ER-560; 1-ER-16. And

it highlighted the authors' view that "*packs with a dominant coastal ancestry* should be considered a priority for conservation" because of "their unique evolutionary heritage and adaptations."[9] 1-ER-16 (citing 3-ER-560) (emphasis added). Based on this sentence, the court concluded that the Service failed to "thoughtful[ly]" engage with this allegedly conflicting data. 1-ER-17.

But, contrary to the district court's ruling, the Service considered and thoughtfully explained its views on this subject. 3-ER-381. It noted that of the wolves Hendricks sampled from Washington and Oregon, just two individuals (both from Washington) possessed "mitochondrial DNA haplotypes only known from wolf populations in coastal British Columbia." 3-ER-381. And only one of those two wolves resided in part of the 44-state entity. 3-ER-381. The other wolf resided within the boundary of the delisted Northern Rocky Mountain DPS. 3-ER-381.

The Service also recognized nuclear DNA analysis results showing that three wolves sampled from Washington fell "intermediate between [Northern Rocky Mountain] wolves and coastal wolves, indicating that Washington was an admixture zone." 3-ER-381. Given this evidence, the agency ultimately concluded that these wolves "originate[d] primarily from the interior forest ecotype," not the coastal ecotype highlighted by the district court. 3-ER-381; *cf.* 1-ER-16; 3-ER-560.

_____

[9] The district court cited page 3-ER-560, which appears to be identical to page 3-ER-488 in the study cited in the Rule. The court also cited to the same sentence that appeared in another article by the same author. 3-ER-543.

Put another way, even if Hendrick's (and the district court's) policy views about the prioritization of wolf conservation are creditable,[10] the Service scrutinized the genetic makeup of West Coast wolves and concluded that there were no packs with dominant coastal ancestry. *See* 3-ER-381. The district court's "difference of opinion" about how to interpret the studies "does not warrant a contrary conclusion." *Ctr. for Biological Diversity*, 900 F.3d at 1074. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378; *accord Trout Unlimited*, 559 F.3d at 959.

The district court inferred that the Service's scientific decision about the genetic history of West Coast wolves meant that the Service did not analyze any threats to those wolves. 1-ER-15–17. Not so. As explained in the Rule, the Service analyzed threats to wolves inhabiting the Pacific coast in the lower United States, *see supra* pp. 28–32, and found that gray wolves are not in danger of extinction or likely to become so in the foreseeable future. 3-ER-381. Indeed, the Service evaluated these wolves under all three configurations: West Coast wolves were

---

[10] Contrary to the district court's suggestion, an article's conclusion that certain wolves should be considered for conservation does not mean that these wolves are threatened or endangered under the ESA.

included as part of the separate listed 44-state entity, combined with the Minnesota entity, and part of the lower 48-state entity. *See supra* p. 18.

In short, the Service provided a reasoned explanation for its conclusion that West Coast wolves are not genetically distinct. In fact, the agency specifically addressed the data about coastal wolves, and explained how it resolved that issue in a reasonable manner. "Because the Service has articulated reasoned connections between the record and its conclusion, its genetic analysis was not arbitrary or capricious." *Nw. Ecosystem All.*, 475 F.3d at 1150.

## IV. The Service rationally concluded that regulatory mechanisms were adequate.

The ESA's five-factor framework requires the Service to assess the overall effect certain stressors have on a species now and in the foreseeable future. 16 U.S.C. § 1533(a)(1). Because these stressors can be ameliorated or exacerbated by existing regulatory mechanisms or conservation efforts, the Service considers those regimes in its analysis. *Id.* § 1533(a)(1)(D). The Service ultimately concluded that state and Tribal regulatory mechanisms would sufficiently ameliorate the threat of human-caused mortality to gray wolves post-delisting (after which management of the species would return to the states). 3-ER-347–369. The district court upheld that conclusion, determining that the Service rationally concluded that existing state mechanisms would "provide adequate protection for the gray wolf." 1-ER-23–26.

Despite the Service's extensive analysis of state and Tribal regulatory mechanisms, the district court held that the Service should have more thoroughly examined whether *federal* mechanisms would also protect wolves after delisting. 1-ER-26. In particular, the district court was troubled by the fact that some Forest Service land management plans in the West Coast "do not contain standards and guidelines specific to wolf management." 1-ER-26 (quoting 3-ER-368). The court also criticized the Service for "not explain[ing] how [federal] mechanisms will ensure a sustainable wolf population post-delisting." 1-ER-26. The district court's ruling is wrong, both as a legal and factual matter.

The plain language of the ESA requires the Service to consider whether a species would be imperiled by "the inadequacy of existing regulatory mechanisms" after delisting. 16 U.S.C. § 1533(a)(1)(D). Nowhere does the Act state that the Service must consider whether other, non-existent regulatory mechanisms would offer better or additional protection for the species. The Service must simply decide whether existing mechanisms are *inadequate* to address any threats and maintain the species in a recovered condition. *Id.*

The Service does not make this decision "in isolation." *Friends of Blackwater v. Salazar*, 691 F.3d 428, 436 (D.C. Cir. 2012). Rather, the Service considers the adequacy of regulatory mechanisms against the threat that the regulation is designed to meet. *Id.* Put simply, a regulation can be "inadequate" only if there is something

58

needing regulation—i.e., an actual threat to the species. "If the adequacy or 'inadequacy of existing regulat[ion]' is to be judged without considering the level, or even the existence, of any threat the regulation is designed to meet, then it would follow that the Service could never delist a species unless some regulatory mechanism was in place to protect it—whether needed or not." *Id.*

Humans are the primary threat to wolves. 3-ER-347. The Service therefore extensively evaluated state hunting regulations and other state and Tribal protections in place at the time of its review that were intended to ameliorate the threat of human-caused mortality. 3-ER-347–69. Those laws and regulations would also apply to gray wolves on federal lands in those states after delisting, as states are the main regulators of hunting on most federal land. *See, e.g.*, 3-ER-351; 3-ER-367. Thus, the Service's conclusion that state regulatory mechanisms are adequate to protect wolves post-delisting applies with equal force to wolves on federal lands.

Indeed, the Service recognized that various land management agencies "will provide protections to wolves in the areas they manage that will match, and in some cases exceed, the protections provided by State wolf-management plans and State regulations." 3-ER-369. For example, hunting is prohibited on national park and wildlife refuge land, and many national forests intentionally protect wolf den sites and rendezvous sites, and carefully manage road densities in existing and potential wolf habitat. 3-ER-367; *see also* 3-ER-368 (noting that management plans for

wolves in West Coast states similarly "provide for the conservation of natural and cultural resources and wildlife" and "the gray wolf and its habitat are expected to persist on these lands once federally delisted").

The district court overlooked that important context and instead focused on the Service's observation that some land management plans in the West "do not contain standards and guidelines specific to wolf management." 1-ER-26. But there is nothing in the record suggesting that any specific standards or guidelines were needed to address a particular threat to wolves in those areas at the time of the Rule. 3-ER-368. And, again, the relevant question under the ESA is whether the existing regulations are *inadequate*, not whether they are the best or most protective.

The district court also reprimanded the Service for not explaining how federal land management agencies (the Forest Service and Bureau of Land Management) "will ensure a sustainable wolf population post-delisting." 1-ER-26. But the Service included that explanation in the Rule. 3-ER-368. For example, it explained that, once delisted, the gray wolf will be considered a "sensitive species" under existing federal regulations for at least five years. 3-ER-368. Federal agencies implement special measures to conserve sensitive species and their habitats, "to promote their conservation and minimize the likelihood and need for [ESA] listing." 3-ER-368. That means, the Service explained, that federal agencies will consider "conservation objectives for the gray wolf and its habitat" during the planning and implementation

of all projects on those lands. 3-ER-368. As a result, the Service rationally concluded that, together with state and Tribal regulatory mechanisms, existing federal mechanisms were adequate to ensure the long-term, recovered status of wolves. 3-ER-368–69. The Court should respect that decision.

## CONCLUSION

For these reasons, the district court's judgment should be reversed.

Respectfully submitted,

s/ *Amelia G. Yowell*
TODD KIM
*Assistant Attorney General*

JOAN M. PEPIN
MICHAEL R. EITEL
ASTRID CEVALLOS
AMELIA G. YOWELL
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 514-5580
amelia.yowell@usdoj.gov

Of Counsel:

KRISTEN BYRNES FLOOM
*Attorney*
U.S. Department of the Interior
Office of the Solicitor

September 13, 2024
90-8-6-08427

**Form 8.  Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**: 22-15529, 22-15532, 22-15534, 22-15535, 22-15536, 22-15537, 22-15626, 22-15627, 22-15628

I am the attorney or self-represented party.

**This brief contains 13,771 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**    s/ *Amelia G. Yowell*

**Date**         SEPTEMBER 13, 2024

# ADDENDUM

Administrative Procedure Act

    5 U.S.C. § 706...........................................................................Add-1

Endangered Species Act

    16 U.S.C. § 1531....................................................................Add-2

    16 U.S.C. § 1532....................................................................Add-5

    16 U.S.C. § 1533....................................................................Add-7

50 C.F.R. § 424.11 (2019) ......................................................Add-13



In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

**Statutory Notes and Related Subsidiaries**

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

**§706. Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.



## CHAPTER 35—ENDANGERED SPECIES

Sec.
1531. Congressional findings and declaration of purposes and policy.
1532. Definitions.
1533. Determination of endangered species and threatened species.
1534. Land acquisition.
1535. Cooperation with States.
1536. Interagency cooperation.
1537. International cooperation.
1537a. Convention implementation.
1538. Prohibited acts.
1539. Exceptions.
1540. Penalties and enforcement.
1541. Endangered plants.
1542. Authorization of appropriations.
1543. Construction with Marine Mammal Protection Act of 1972.
1544. Annual cost analysis by Fish and Wildlife Service.

### § 1531. Congressional findings and declaration of purposes and policy

#### (a) Findings

The Congress finds and declares that—

(1) various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation;

(2) other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction;

(3) these species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people;

(4) the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing worldwide extinction, pursuant to—

(A) migratory bird treaties with Canada and Mexico;

(B) the Migratory and Endangered Bird Treaty with Japan;

(C) the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere;

(D) the International Convention for the Northwest Atlantic Fisheries;

(E) the International Convention for the High Seas Fisheries of the North Pacific Ocean;

(F) the Convention on International Trade in Endangered Species of Wild Fauna and Flora; and

(G) other international agreements; and

(5) encouraging the States and other interested parties, through Federal financial assistance and a system of incentives, to develop and maintain conservation programs which meet national and international standards is a key to meeting the Nation's international commitments and to better safeguarding, for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants.

**(b) Purposes**

The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

**(c) Policy**

(1) It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.

(2) It is further declared to be the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.

(Pub. L. 93–205, §2, Dec. 28, 1973, 87 Stat. 884; Pub. L. 96–159, §1, Dec. 28, 1979, 93 Stat. 1225; Pub. L. 97–304, §9(a), Oct. 13, 1982, 96 Stat. 1426; Pub. L. 100–478, title I, §1013(a), Oct. 7, 1988, 102 Stat. 2315.)

### Editorial Notes

#### References in Text

This chapter, referred to in subsecs. (b) and (c)(1), was in the original "this Act", meaning Pub. L. 93–205, Dec. 28, 1973, 81 Stat. 884, known as the Endangered Species Act of 1973, which is classified principally to this chap-

ter. For complete classification of this Act to the Code, see Short Title note set out below and Tables.

#### Amendments

1988—Subsec. (a)(4)(G). Pub. L. 100–478 substituted ''; and'' for period at end.

1982—Subsec. (c). Pub. L. 97–304 designated existing provisions as par. (1) and added par. (2).

1979—Subsec. (a)(5). Pub. L. 96–159 substituted ''wildlife, and plants'' for ''wildlife''.

### Statutory Notes and Related Subsidiaries

#### Effective Date

Pub. L. 93–205, §16, Dec. 28, 1973, 87 Stat. 903, provided that: ''This Act [enacting this chapter, amending sections 460k–1, 460l–9, 668dd, 715i, 715s, 1362, 1371, 1372, and 1402 of this title and section 136 of Title 7, Agriculture, repealing sections 668aa to 668cc–6 of this title, and enacting provisions set out as notes under this section] shall take effect on the date of its enactment [Dec. 28, 1973].''

#### Short Title of 1982 Amendment

Pub. L. 97–304, §1, Oct. 13, 1982, 96 Stat. 1411, provided: ''That this Act [amending this section and sections 1532, 1533, 1535, 1536, 1537a, 1538, 1539, 1540, and 1542 of this title and enacting provisions set out as notes under sections 1533, 1537a, and 1539 of this title] may be cited as the 'Endangered Species Act Amendments of 1982'.''

#### Short Title of 1978 Amendment

Pub. L. 95–632, §1, Nov. 10, 1978, 92 Stat. 3751, provided: ''That this Act [amending sections 1532 to 1536, 1538 to 1540, and 1542 of this title] may be cited as the 'Endangered Species Act Amendments of 1978'.''

#### Short Title

Pub. L. 93–205, §1, Dec. 28, 1973, 87 Stat. 884, provided: ''That this Act [enacting this chapter, amending sections 460k–1, 460l–9, 668dd, 715i, 715s, 1362, 1371, 1372, and 1402 of this title and section 136 of Title 7, Agriculture, repealing sections 668aa to 668cc–6 of this title, and enacting provisions set out as notes under this section] may be cited as the 'Endangered Species Act of 1973'.''

#### Wildlife Management and Working Lands for Wildlife Conservation Model

Pub. L. 115–334, title II, §2407, Dec. 20, 2018, 132 Stat. 4573, provided that:

''(a) In General.—The Secretary [of Agriculture] and the Secretary of the Interior shall continue to carry out the Working Lands for Wildlife model of conservation on working landscapes, as implemented on the day before the date of enactment of this Act [Dec. 20, 2018], in accordance with—

''(1) the document entitled 'Partnership Agreement Between the United States Department of Agriculture Natural Resources Conservation Service and the United States Department of the Interior Fish and Wildlife Service', numbered A–3A7516–937, and formalized by the Chief of the Natural Resources Conservation Service on September 15, 2016, and by the Director of the United States Fish and Wildlife Service on August 4, 2016, as in effect on September 15, 2016; and

''(2) United States Fish and Wildlife Service Director's Order No. 217, dated August 9, 2016, as in effect on August 9, 2016.

''(b) Expansion of Model.—The Secretary and the Secretary of the Interior may expand the conservation model described in subsection (a) through a new partnership agreement between the Farm Service Agency and the United States Fish and Wildlife Service for the purpose of carrying out conservation activities for species conservation.

''(c) Extension of Period of Regulatory Predictability.—

''(1) DEFINITION OF PERIOD OF REGULATORY PREDICT-ABILITY.—In this subsection, the term 'period of regulatory predictability' means the period of regulatory predictability under the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.) initially determined in accordance with the document and order described in paragraphs (1) and (2), respectively, of subsection (a).

''(2) EXTENSION.—After the period of regulatory predictability, on request of the Secretary, the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service, may provide additional consultation under section 7(a)(2) of the Endangered Species Act of 1973 (16 U.S.C. 1536(a)(2)), or additional conference under section 7(a)(4) of that Act (16 U.S.C. 1536(a)(4)), as applicable, with the Chief of the Natural Resources Conservation Service or the Administrator of the Farm Service Agency, as applicable, to extend the period of regulatory predictability.''

RELATIONSHIP TO ENDANGERED SPECIES ACT OF 1973

Pub. L. 102–251, title III, §305, Mar. 9, 1992, 106 Stat. 66, as amended by Pub. L. 104–208, div. A, title I, §101(a) [title II, §211(b)], Sept. 30, 1996, 110 Stat. 3009, 3009–41, provided that: ''The special areas defined in section 3(24) of the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1802(24)) shall be considered places that are subject to the jurisdiction of the United States for the purposes of the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.).''

**Executive Documents**

MINIMIZATION OF CONFLICTS WITH RECREATIONAL FISHERIES

For provision that all Federal agencies minimize conflicts between recreational fisheries and administration of this chapter, see Ex. Ord. No. 12962, §4, June 7, 1995, 60 F.R. 30770, set out as a note under section 1801 of this title.

EX. ORD. NO. 13648. COMBATING WILDLIFE TRAFFICKING

Ex. Ord. No. 13648, July 1, 2013, 78 F.R. 40621, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to address the significant effects of wildlife trafficking on the national interests of the United States, I hereby order as follows:

SECTION 1. *Policy.* The poaching of protected species and the illegal trade in wildlife and their derivative parts and products (together known as ''wildlife trafficking'') represent an international crisis that continues to escalate. Poaching operations have expanded beyond small-scale, opportunistic actions to coordinated slaughter commissioned by armed and organized criminal syndicates. The survival of protected wildlife species such as elephants, rhinos, great apes, tigers, sharks, tuna, and turtles has beneficial economic, social, and environmental impacts that are important to all nations. Wildlife trafficking reduces those benefits while generating billions of dollars in illicit revenues each year, contributing to the illegal economy, fueling instability, and undermining security. Also, the prevention of trafficking of live animals helps us control the spread of emerging infectious diseases. For these reasons, it is in the national interest of the United States to combat wildlife trafficking.

In order to enhance domestic efforts to combat wildlife trafficking, to assist foreign nations in building capacity to combat wildlife trafficking, and to assist in combating transnational organized crime, executive departments and agencies (agencies) shall take all appropriate actions within their authority, including the promulgation of rules and regulations and the provision of technical and financial assistance, to combat wildlife trafficking in accordance with the following objectives:

(a) in appropriate cases, the United States shall seek to assist those governments in anti-wildlife trafficking activities when requested by foreign nations experiencing trafficking of protected wildlife;

(b) the United States shall promote and encourage the development and enforcement by foreign nations of effective laws to prohibit the illegal taking of, and trade in, these species and to prosecute those who engage in wildlife trafficking, including by building capacity;

(c) in concert with the international community and partner organizations, the United States shall seek to combat wildlife trafficking; and

(d) the United States shall seek to reduce the demand for illegally traded wildlife, both at home and abroad, while allowing legal and legitimate commerce involving wildlife.

SEC. 2. *Establishment.* There is established a Presidential Task Force on Wildlife Trafficking (Task Force), to be co-chaired by the Secretary of State, Secretary of the Interior, and the Attorney General (Co-Chairs), or their designees, who shall report to the President through the National Security Advisor. The Task Force shall develop and implement a National Strategy for Combating Wildlife Trafficking in accordance with the objectives outlined in section 1 of this order, consistent with section 4 of this order.

SEC. 3. *Membership.* (a) In addition to the Co-Chairs, the Task Force shall include designated senior-level representatives from:

(i) the Department of the Treasury;

(ii) the Department of Defense;

(iii) the Department of Agriculture;

(iv) the Department of Commerce;

(v) the Department of Transportation;

(vi) the Department of Homeland Security;

(vii) the United States Agency for International Development;

(viii) the Office of the Director of National Intelligence;

(ix) the National Security Staff;

(x) the Domestic Policy Council;

(xi) the Council on Environmental Quality;

(xii) the Office of Science and Technology Policy;

(xiii) the Office of Management and Budget;

(xiv) the Office of the United States Trade Representative; and

(xv) such agencies and offices as the Co-Chairs may, from time to time, designate.

(b) The Task Force shall meet not later than 60 days from the date of this order and periodically thereafter.

SEC. 4. *Functions.* Consistent with the authorities and responsibilities of member agencies, the Task Force shall perform the following functions:

(a) not later than 180 days after the date of this order, produce a National Strategy for Combating Wildlife Trafficking that shall include consideration of issues relating to combating trafficking and curbing consumer demand, including:

(i) effective support for anti-poaching activities;

(ii) coordinating regional law enforcement efforts;

(iii) developing and supporting effective legal enforcement mechanisms; and

(iv) developing strategies to reduce illicit trade and reduce consumer demand for trade in protected species;

(b) not later than 90 days from the date of this order, review the Strategy to Combat Transnational Organized Crime of July 19, 2011, and, if appropriate, make recommendations regarding the inclusion of crime related to wildlife trafficking as an implementation element for the Federal Government's transnational organized crime strategy;

(c) coordinate efforts among and consult with agencies, as appropriate and consistent with the Department of State's foreign affairs role, regarding work with foreign nations and international bodies that monitor and aid in enforcement against crime related to wildlife trafficking; and

(d) carry out other functions necessary to implement this order.

SEC. 5. *Advisory Council on Wildlife Trafficking.* Not later than 180 days from the date of this order, the Sec-

retary of the Interior (Secretary), in consultation with the other Co-Chairs of the Task Force, shall establish an Advisory Council on Wildlife Trafficking (Advisory Council) that shall make recommendations to the Task Force and provide it with ongoing advice and assistance. The Advisory Council shall have eight members, one of whom shall be designated by the Secretary as the Chair. Members shall not be employees of the Federal Government and shall include knowledgeable individuals from the private sector, former governmental officials, representatives of nongovernmental organizations, and others who are in a position to provide expertise and support to the Task Force.

SEC. 6. *General Provisions.* (a) This order shall be implemented consistent with applicable domestic and international law, and subject to the availability of appropriations.

(b) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof, or the status of that department or agency within the Federal Government; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) Insofar as the Federal Advisory Committee Act, as amended ([former] 5 U.S.C. App.) [see 5 U.S.C. 1001 et seq.] (the "Act"), may apply to the Advisory Council, any functions of the President under the Act, except for that of reporting to the Congress, shall be performed by the Secretary in accordance with the guidelines issued by the Administrator of General Services.

(e) The Department of the Interior shall provide funding and administrative support for the Task Force and Advisory Council to the extent permitted by law and consistent with existing appropriations.

BARACK OBAMA.

[Reference to the National Security Staff to be understood to refer to the staff of the National Security Council, see Ex. Ord. No. 13657, set out as a note under section 3021 of Title 50, War and National Defense.]

EXTENSION OF TERM OF ADVISORY COUNCIL ON WILDLIFE TRAFFICKING

Term of Advisory Council on Wildlife Trafficking extended until Sept. 30, 2017, by Ex. Ord. No. 13708, Sept. 30, 2015, 80 F.R. 60271, formerly set out as a note under section 1013 of Title 5, Government Organization and Employees.

§ 1532. Definitions

For the purposes of this chapter—

(1) The term "alternative courses of action" means all alternatives and thus is not limited to original project objectives and agency jurisdiction.

(2) The term "commercial activity" means all activities of industry and trade, including, but not limited to, the buying or selling of commodities and activities conducted for the purpose of facilitating such buying and selling: *Provided, however,* That it does not include exhibition of commodities by museums or similar cultural or historical organizations.

(3) The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

(4) The term "Convention" means the Convention on International Trade in Endangered Species of Wild Fauna and Flora, signed on March 3, 1973, and the appendices thereto.

(5)(A) The term "critical habitat" for a threatened or endangered species means—

(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

(B) Critical habitat may be established for those species now listed as threatened or endangered species for which no critical habitat has heretofore been established as set forth in subparagraph (A) of this paragraph.

(C) Except in those circumstances determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species.

(6) The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man.

(7) The term "Federal agency" means any department, agency, or instrumentality of the United States.

(8) The term "fish or wildlife" means any member of the animal kingdom, including without limitation any mammal, fish, bird (including any migratory, nonmigratory, or endangered bird for which protection is also afforded by treaty or other international agreement), amphibian, reptile, mollusk, crustacean, arthropod or other invertebrate, and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof.

(9) The term "foreign commerce" includes, among other things, any transaction—

(A) between persons within one foreign country;

(B) between persons in two or more foreign countries;

(C) between a person within the United States and a person in a foreign country; or

(D) between persons within the United States, where the fish and wildlife in ques-

tion are moving in any country or countries outside the United States.

(10) The term ''import'' means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, whether or not such landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States.

(11) Repealed. Pub. L. 97–304, §4(b), Oct. 13, 1982, 96 Stat. 1420.

(12) The term ''permit or license applicant'' means, when used with respect to an action of a Federal agency for which exemption is sought under section 1536 of this title, any person whose application to such agency for a permit or license has been denied primarily because of the application of section 1536(a) of this title to such agency action.

(13) The term ''person'' means an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States.

(14) The term ''plant'' means any member of the plant kingdom, including seeds, roots and other parts thereof.

(15) The term ''Secretary'' means, except as otherwise herein provided, the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of Reorganization Plan Numbered 4 of 1970; except that with respect to the enforcement of the provisions of this chapter and the Convention which pertain to the importation or exportation of terrestrial plants, the term also means the Secretary of Agriculture.

(16) The term ''species'' includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature.

(17) The term ''State'' means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, the Virgin Islands, Guam, and the Trust Territory of the Pacific Islands.

(18) The term ''State agency'' means any State agency, department, board, commission, or other governmental entity which is responsible for the management and conservation of fish, plant, or wildlife resources within a State.

(19) The term ''take'' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

(20) The term ''threatened species'' means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

(21) The term ''United States'', when used in a geographical context, includes all States.

(Pub. L. 93–205, §3, Dec. 28, 1973, 87 Stat. 885; Pub. L. 94–359, §5, July 12, 1976, 90 Stat. 913; Pub. L. 95–632, §2, Nov. 10, 1978, 92 Stat. 3751; Pub. L. 96–159, §2, Dec. 28, 1979, 93 Stat. 1225; Pub. L. 97–304, §4(b), Oct. 13, 1982, 96 Stat. 1420; Pub. L. 100–478, title I, §1001, Oct. 7, 1988, 102 Stat. 2306.)

**Editorial Notes**

REFERENCES IN TEXT

This chapter, referred to in text, was in the original ''this Act'', meaning Pub. L. 93–205, Dec. 28, 1973, 81 Stat. 884, known as the Endangered Species Act of 1973, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1531 of this title and Tables.

Reorganization Plan Numbered 4 of 1970, referred to in par. (15), is Reorg. Plan No. 4 of 1970, eff. Oct. 3, 1970, 35 F.R. 15627, 84 Stat. 2090, which is set out in the Appendix to Title 5, Government Organization and Employees.

AMENDMENTS

1988—Par. (13). Pub. L. 100–478, §1001(a), amended par. (13) generally. Prior to amendment, par. (13) read as follows: ''The term 'person' means an individual, corporation, partnership, trust, association, or any other private entity, or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State or political subdivision thereof, or of any foreign government.''

Par. (15). Pub. L. 100–478, §1001(b), inserted ''also'' before ''means the Secretary of Agriculture''.

1982—Par. (11). Pub. L. 97–304 struck out par. (11) which defined ''irresolvable conflict'' as, with respect to any action authorized, funded, or carried out by a Federal agency, a set of circumstances under which, after consultation as required in section 1536(a) of this title, completion of such action would violate section 1536(a)(2) of this title.

1979—Par. (11). Pub. L. 96–159 substituted ''action would violate section 1536(a)(2) of this title'' for ''action would (A) jeopardize the continued existence of an endangered or threatened species, or (B) result in the adverse modification or destruction of a critical habitat''.

1978—Pars. (1) to (4). Pub. L. 95–632, §2(1), (7), added par. (1) and redesignated former pars. (1) to (3) as (2) to (4), respectively. Former par. (4) redesignated (6).

Par. (5). Pub. L. 95–632, §2(2), (7), added par. (5). Former par. (5) redesignated (8).

Par. (6). Pub. L. 95–632, §2(7), redesignated former par. (4) as (6). Former par. (6) redesignated (9).

Par. (7). Pub. L. 95–632, §2(3), (7), added par. (7). Former par. (7) redesignated (10).

Pars. (8) to (10). Pub. L. 95–632, §2(7), redesignated former pars. (5) to (7) as (8) to (10), respectively. Former pars. (8) to (10) redesignated (13) to (15), respectively.

Pars. (11), (12). Pub. L. 95–632, §2(4), (7), added pars. (11) and (12). Former pars. (11) and (12) redesignated (16) and (17), respectively.

Pars. (13) to (15). Pub. L. 95–632, §2(7), redesignated former pars. (8) to (10) as (13) to (15), respectively. Former pars. (13) to (15) redesignated as (18) to (20), respectively.

Par. (16). Pub. L. 95–632, §2(5), (7), redesignated former par. (11) as (16) and substituted ''and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature'' for ''and any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature''. Former par. (16) redesignated (21).

Par. (17). Pub. L. 95–632, §2(7), redesignated former par. (12) as (17).

Par. (18). Pub. L. 95–632, §2(6), (7), redesignated former par. (13) as (18) and substituted ''fish, plant, or wildlife'' for ''fish or wildlife''.

Pars. (19) to (21). Pub. L. 95–632, §2(7), redesignated pars. (14) to (16) as (19) to (21), respectively.

1976—Par. (1). Pub. L. 94–359 inserted '': *Provided, however*, That it does not include exhibition of commodities by museums or similar cultural or historical organizations.'' after ''facilitating such buying and selling''.

### Executive Documents

Termination of Trust Territory of the Pacific Islands

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

## § 1533. Determination of endangered species and threatened species

### (a) Generally

(1) The Secretary shall by regulation promulgated in accordance with subsection (b) determine whether any species is an endangered species or a threatened species because of any of the following factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

(2) With respect to any species over which program responsibilities have been vested in the Secretary of Commerce pursuant to Reorganization Plan Numbered 4 of 1970—

(A) in any case in which the Secretary of Commerce determines that such species should—

(i) be listed as an endangered species or a threatened species, or

(ii) be changed in status from a threatened species to an endangered species,

he shall so inform the Secretary of the Interior; who shall list such species in accordance with this section;

(B) in any case in which the Secretary of Commerce determines that such species should—

(i) be removed from any list published pursuant to subsection (c) of this section, or

(ii) be changed in status from an endangered species to a threatened species,

he shall recommend such action to the Secretary of the Interior, and the Secretary of the Interior, if he concurs in the recommendation, shall implement such action; and

(C) the Secretary of the Interior may not list or remove from any list any such species, and may not change the status of any such species which are listed, without a prior favorable determination made pursuant to this section by the Secretary of Commerce.

(3)(A) The Secretary, by regulation promulgated in accordance with subsection (b) and to the maximum extent prudent and determinable—

(i) shall, concurrently with making a determination under paragraph (1) that a species is

an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and

(ii) may, from time-to-time thereafter as appropriate, revise such designation.

(B)(i) The Secretary shall not designate as critical habitat any lands or other geographical areas owned or controlled by the Department of Defense, or designated for its use, that are subject to an integrated natural resources management plan prepared under section 670a of this title, if the Secretary determines in writing that such plan provides a benefit to the species for which critical habitat is proposed for designation.

(ii) Nothing in this paragraph affects the requirement to consult under section 1536(a)(2) of this title with respect to an agency action (as that term is defined in that section).

(iii) Nothing in this paragraph affects the obligation of the Department of Defense to comply with section 1538 of this title, including the prohibition preventing extinction and taking of endangered species and threatened species.

### (b) Basis for determinations

(1)(A) The Secretary shall make determinations required by subsection (a)(1) solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction; or on the high seas.

(B) In carrying out this section, the Secretary shall give consideration to species which have been—

(i) designated as requiring protection from unrestricted commerce by any foreign nation, or pursuant to any international agreement; or

(ii) identified as in danger of extinction, or likely to become so within the foreseeable future, by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish or wildlife or plants.

(2) The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

(3)(A) To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of title 5, to add a species to, or to remove a species from,

either of the lists published under subsection (c), the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted. If such a petition is found to present such information, the Secretary shall promptly commence a review of the status of the species concerned. The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

(B) Within 12 months after receiving a petition that is found under subparagraph (A) to present substantial information indicating that the petitioned action may be warranted, the Secretary shall make one of the following findings:

(i) The petitioned action is not warranted, in which case the Secretary shall promptly publish such finding in the Federal Register.

(ii) The petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a general notice and the complete text of a proposed regulation to implement such action in accordance with paragraph (5).

(iii) The petitioned action is warranted, but that—

(I) the immediate proposal and timely promulgation of a final regulation implementing the petitioned action in accordance with paragraphs (5) and (6) is precluded by pending proposals to determine whether any species is an endangered species or a threatened species, and

(II) expeditious progress is being made to add qualified species to either of the lists published under subsection (c) and to remove from such lists species for which the protections of this chapter are no longer necessary,

in which case the Secretary shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based.

(C)(i) A petition with respect to which a finding is made under subparagraph (B)(iii) shall be treated as a petition that is resubmitted to the Secretary under subparagraph (A) on the date of such finding and that presents substantial scientific or commercial information that the petitioned action may be warranted.

(ii) Any negative finding described in subparagraph (A) and any finding described in subparagraph (B)(i) or (iii) shall be subject to judicial review.

(iii) The Secretary shall implement a system to monitor effectively the status of all species with respect to which a finding is made under subparagraph (B)(iii) and shall make prompt use of the authority under paragraph 7 [1] to prevent a significant risk to the well being of any such species.

(D)(i) To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of title 5, to revise a critical habitat designation, the Secretary shall make a finding as to whether the petition presents substantial scientific information indicating that the revision may be war-

ranted. The Secretary shall promptly publish such finding in the Federal Register.

(ii) Within 12 months after receiving a petition that is found under clause (i) to present substantial information indicating that the requested revision may be warranted, the Secretary shall determine how he intends to proceed with the requested revision, and shall promptly publish notice of such intention in the Federal Register.

(4) Except as provided in paragraphs (5) and (6) of this subsection, the provisions of section 553 of title 5 (relating to rulemaking procedures), shall apply to any regulation promulgated to carry out the purposes of this chapter.

(5) With respect to any regulation proposed by the Secretary to implement a determination, designation, or revision referred to in subsection (a)(1) or (3), the Secretary shall—

(A) not less than 90 days before the effective date of the regulation—

(i) publish a general notice and the complete text of the proposed regulation in the Federal Register, and

(ii) give actual notice of the proposed regulation (including the complete text of the regulation) to the State agency in each State in which the species is believed to occur, and to each county, or equivalent jurisdiction in which the species is believed to occur, and invite the comment of such agency, and each such jurisdiction, thereon;

(B) insofar as practical, and in cooperation with the Secretary of State, give notice of the proposed regulation to each foreign nation in which the species is believed to occur or whose citizens harvest the species on the high seas, and invite the comment of such nation thereon;

(C) give notice of the proposed regulation to such professional scientific organizations as he deems appropriate;

(D) publish a summary of the proposed regulation in a newspaper of general circulation in each area of the United States in which the species is believed to occur; and

(E) promptly hold one public hearing on the proposed regulation if any person files a request for such a hearing within 45 days after the date of publication of general notice.

(6)(A) Within the one-year period beginning on the date on which general notice is published in accordance with paragraph (5)(A)(i) regarding a proposed regulation, the Secretary shall publish in the Federal Register—

(i) if a determination as to whether a species is an endangered species or a threatened species, or a revision of critical habitat, is involved, either—

(I) a final regulation to implement such determination,

(II) a final regulation to implement such revision or a finding that such revision should not be made,

(III) notice that such one-year period is being extended under subparagraph (B)(i), or

(IV) notice that the proposed regulation is being withdrawn under subparagraph (B)(ii), together with the finding on which such withdrawal is based; or

(ii) subject to subparagraph (C), if a designation of critical habitat is involved, either—

---

[1] So in original. Probably should be paragraph "(7)".

(I) a final regulation to implement such designation, or

(II) notice that such one-year period is being extended under such subparagraph.

(B)(i) If the Secretary finds with respect to a proposed regulation referred to in subparagraph (A)(i) that there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned, the Secretary may extend the one-year period specified in subparagraph (A) for not more than six months for purposes of soliciting additional data.

(ii) If a proposed regulation referred to in subparagraph (A)(i) is not promulgated as a final regulation within such one-year period (or longer period if extension under clause (i) applies) because the Secretary finds that there is not sufficient evidence to justify the action proposed by the regulation, the Secretary shall immediately withdraw the regulation. The finding on which a withdrawal is based shall be subject to judicial review. The Secretary may not propose a regulation that has previously been withdrawn under this clause unless he determines that sufficient new information is available to warrant such proposal.

(iii) If the one-year period specified in subparagraph (A) is extended under clause (i) with respect to a proposed regulation, then before the close of such extended period the Secretary shall publish in the Federal Register either a final regulation to implement the determination or revision concerned, a finding that the revision should not be made, or a notice of withdrawal of the regulation under clause (ii), together with the finding on which the withdrawal is based.

(C) A final regulation designating critical habitat of an endangered species or a threatened species shall be published concurrently with the final regulation implementing the determination that such species is endangered or threatened, unless the Secretary deems that—

(i) it is essential to the conservation of such species that the regulation implementing such determination be promptly published; or

(ii) critical habitat of such species is not then determinable, in which case the Secretary, with respect to the proposed regulation to designate such habitat, may extend the one-year period specified in subparagraph (A) by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat.

(7) Neither paragraph (4), (5), or (6) of this subsection nor section 553 of title 5 shall apply to any regulation issued by the Secretary in regard to any emergency posing a significant risk to the well-being of any species of fish or wildlife or plants, but only if—

(A) at the time of publication of the regulation in the Federal Register the Secretary publishes therein detailed reasons why such regulation is necessary; and

(B) in the case such regulation applies to resident species of fish or wildlife, or plants, the Secretary gives actual notice of such regulation to the State agency in each State in which such species is believed to occur.

Such regulation shall, at the discretion of the Secretary, take effect immediately upon the publication of the regulation in the Federal Register. Any regulation promulgated under the authority of this paragraph shall cease to have force and effect at the close of the 240-day period following the date of publication unless, during such 240-day period, the rulemaking procedures which would apply to such regulation without regard to this paragraph are complied with. If at any time after issuing an emergency regulation the Secretary determines, on the basis of the best appropriate data available to him, that substantial evidence does not exist to warrant such regulation, he shall withdraw it.

(8) The publication in the Federal Register of any proposed or final regulation which is necessary or appropriate to carry out the purposes of this chapter shall include a summary by the Secretary of the data on which such regulation is based and shall show the relationship of such data to such regulation; and if such regulation designates or revises critical habitat, such summary shall, to the maximum extent practicable, also include a brief description and evaluation of those activities (whether public or private) which, in the opinion of the Secretary, if undertaken may adversely modify such habitat, or may be affected by such designation.

**(c) Lists**

(1) The Secretary of the Interior shall publish in the Federal Register a list of all species determined by him or the Secretary of Commerce to be endangered species and a list of all species determined by him or the Secretary of Commerce to be threatened species. Each list shall refer to the species contained therein by scientific and common name or names, if any, specify with respect to each such species over what portion of its range it is endangered or threatened, and specify any critical habitat within such range. The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b).

(2) The Secretary shall—

(A) conduct, at least once every five years, a review of all species included in a list which is published pursuant to paragraph (1) and which is in effect at the time of such review; and

(B) determine on the basis of such review whether any such species should—

(i) be removed from such list;

(ii) be changed in status from an endangered species to a threatened species; or

(iii) be changed in status from a threatened species to an endangered species.

Each determination under subparagraph (B) shall be made in accordance with the provisions of subsections (a) and (b).

**(d) Protective regulations**

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Sec-

retary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.

**(e) Similarity of appearance cases**

The Secretary may, by regulation of commerce or taking, and to the extent he deems advisable, treat any species as an endangered species or threatened species even though it is not listed pursuant to this section if he finds that—

(A) such species so closely resembles in appearance, at the point in question, a species which has been listed pursuant to such section that enforcement personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species;

(B) the effect of this substantial difficulty is an additional threat to an endangered or threatened species; and

(C) such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of this chapter.

**(f) Recovery plans**

(1) The Secretary shall develop and implement plans (hereinafter in this subsection referred to as ''recovery plans'') for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable—

(A) give priority to those endangered species or threatened species, without regard to taxonomic classification, that are most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity;

(B) incorporate in each plan—

(i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

(ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

(iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

(2) The Secretary, in developing and implementing recovery plans, may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to chapter 10 of title 5.

(3) The Secretary shall report every two years to the Committee on Environment and Public Works of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives on the status of efforts to develop and implement recovery plans for all species listed pursuant to this section and on the status of all species for which such plans have been developed.

(4) The Secretary shall, prior to final approval of a new or revised recovery plan, provide public notice and an opportunity for public review and comment on such plan. The Secretary shall consider all information presented during the public comment period prior to approval of the plan.

(5) Each Federal agency shall, prior to implementation of a new or revised recovery plan, consider all information presented during the public comment period under paragraph (4).

**(g) Monitoring**

(1) The Secretary shall implement a system in cooperation with the States to monitor effectively for not less than five years the status of all species which have recovered to the point at which the measures provided pursuant to this chapter are no longer necessary and which, in accordance with the provisions of this section, have been removed from either of the lists published under subsection (c).

(2) The Secretary shall make prompt use of the authority under paragraph 7[1] of subsection (b) of this section to prevent a significant risk to the well being of any such recovered species.

**(h) Agency guidelines; publication in Federal Register; scope; proposals and amendments: notice and opportunity for comments**

The Secretary shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively. Such guidelines shall include, but are not limited to—

(1) procedures for recording the receipt and the disposition of petitions submitted under subsection (b)(3) of this section;

(2) criteria for making the findings required under such subsection with respect to petitions;

(3) a ranking system to assist in the identification of species that should receive priority review under subsection (a)(1) of this section; and

(4) a system for developing and implementing, on a priority basis, recovery plans under subsection (f) of this section.

The Secretary shall provide to the public notice of, and opportunity to submit written comments on, any guideline (including any amendment thereto) proposed to be established under this subsection.

**(i) Submission to State agency of justification for regulations inconsistent with State agency's comments or petition**

If, in the case of any regulation proposed by the Secretary under the authority of this section, a State agency to which notice thereof was given in accordance with subsection (b)(5)(A)(ii) files comments disagreeing with all or part of the proposed regulation, and the Secretary issues a final regulation which is in conflict with such comments, or if the Secretary fails to adopt a regulation pursuant to an action peti-

tioned by a State agency under subsection (b)(3), the Secretary shall submit to the State agency a written justification for his failure to adopt regulations consistent with the agency's comments or petition.

(Pub. L. 93–205, §4, Dec. 28, 1973, 87 Stat. 886; Pub. L. 94–359, §1, July 12, 1976, 90 Stat. 911; Pub. L. 95–632, §§11, 13, Nov. 10, 1978, 92 Stat. 3764, 3766; Pub. L. 96–159, §3, Dec. 28, 1979, 93 Stat. 1225; Pub. L. 97–304, §2(a), Oct. 13, 1982, 96 Stat. 1411; Pub. L. 100–478, title I, §§1002–1004, Oct. 7, 1988, 102 Stat. 2306, 2307; Pub. L. 108–136, div. A, title III, §318, Nov. 24, 2003, 117 Stat. 1433; Pub. L. 117–286, §4(a)(113), Dec. 27, 2022, 136 Stat. 4318.)

### Editorial Notes

#### References in Text

Reorganization Plan Numbered 4 of 1970, referred to in subsec. (a)(2), is Reorg. Plan No. 4 of 1970, eff. Oct. 3, 1970, 35 F.R. 15627, 84 Stat. 2090, which is set out in the Appendix to Title 5, Government Organization and Employees.

This chapter, referred to in subsecs. (b)(4), (8), (e)(C), and (g)(1), was in the original "this Act", meaning Pub. L. 93–205, Dec. 28, 1973, 81 Stat. 884, known as the Endangered Species Act of 1973, which is classified principally to this chapter. This chapter, referred to in subsec. (b)(3)(B)(iii)(II), was in the original "the Act" and was translated as if it read "this Act", to reflect the probable intent of Congress. For complete classification of this Act to the Code, see Short Title note set out under section 1531 of this title and Tables.

#### Amendments

2022—Subsec. (f)(2). Pub. L. 117–286 substituted "chapter 10 of title 5." for "the Federal Advisory Committee Act."

2003—Subsec. (a)(3). Pub. L. 108–136, §318(a), designated existing provisions as subpar. (A), redesignated former subpars. (A) and (B) as cls. (i) and (ii), respectively, and added subpar. (B).

Subsec. (b)(2). Pub. L. 108–136, §318(b), inserted "the impact on national security," after "the economic impact,".

1988—Subsec. (b)(3)(C)(iii). Pub. L. 100–478, §1002(a), added subcl. (iii).

Subsec. (e). Pub. L. 100–478, §1002(b), substituted "regulation of commerce or taking," for "regulation," in introductory provisions.

Subsec. (f). Pub. L. 100–478, §1003, amended subsec. (f) generally. Prior to amendment, subsec. (f) read as follows: "The Secretary shall develop and implement plans (hereinafter in this subsection referred to as 'recovery plans') for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans (1) shall, to the maximum extent practicable, give priority to those endangered species or threatened species most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other developmental projects or other forms of economic activity, and (2) may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to the Federal Advisory Committee Act."

Subsecs. (g) to (i). Pub. L. 100–478, §1004, added subsec. (g) and redesignated former subsecs. (g) and (h) as (h) and (i), respectively.

1982—Subsec. (a)(1). Pub. L. 97–304, §2(a)(1)(B), (D), inserted "promulgated in accordance with subsection (b)" after "shall by regulation" in introductory provisions preceding subpar. (A), and struck out provision following subpar. (E), which directed the Secretary, at

the time regulations were proposed, to specify any habitat of a species considered to be a critical habitat but that such specification of critical habitats not apply to species listed prior to Nov. 10, 1978.

Subsec. (a)(1)(A). Pub. L. 97–304, §2(a)(1)(A), redesignated subpar. (1) as (A).

Subsec. (a)(1)(B). Pub. L. 97–304, §2(a)(1)(A), (C), redesignated subpar. (2) as (B) and substituted "recreational," for "sporting,".

Subsec. (a)(1)(C) to (E). Pub. L. 97–304, §2(a)(1)(A), redesignated subpars. (3), (4), and (5) as (C), (D), and (E), respectively.

Subsec. (a)(3). Pub. L. 97–304, §2(a)(1)(E), added par. (3).

Subsec. (b). Pub. L. 97–304, §2(a)(2), completely revised subsec. (b) by, among other changes, requiring the Secretary to base determinations regarding the listing or delisting of species "solely" on the basis of the best scientific and commercial data available, streamlining the listing process by reducing the time periods for rulemaking, consolidating public meetings and hearing requirements, and establishing virtually identical procedures for the listing and delisting of species and for the designation of critical habitat, and altering the evidentiary standard which petitioners must satisfy to warrant a status review of the species proposed for listing or delisting.

Subsec. (b)(1). Pub. L. 97–304, §2(a)(3)(A), struck out ", and from time to time he may by regulation revise," after "Federal Register" and inserted at end "The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b)."

Subsec. (c)(2). Pub. L. 97–304, §2(a)(3)(B), (C), redesignated par. (4) as (2). Former par. (2), directing the Secretary, within 90 days of the receipt of the petition of an interested person under section 553(e) of title 5, to conduct and publish in the Federal Register a review of the status of any listed or unlisted species proposed to be removed from or added to either of the lists published pursuant to paragraph (1) of this subsection, but only if he made and published a finding that such person had presented substantial evidence which in his judgment warranted such a review, was struck out.

Subsec. (c)(3). Pub. L. 97–304, §2(a)(3)(B), struck out par. (3) which had provided that any list in effect on Dec. 27, 1973, of species of fish or wildlife determined by the Secretary of the Interior, pursuant to the Endangered Species Conservation Act of 1969, to be threatened with extinction be republished to conform to the classification for endangered species or threatened species, as the case might be, provided for in this chapter, but until such republication, any such species so listed was to be deemed an endangered species within the meaning of this chapter, and that the republication of any species pursuant to this paragraph did not require public hearing or comment under section 553 of title 5.

Subsec. (c)(4). Pub. L. 97–304, §2(a)(3)(C), redesignated par. (4) as (2).

Subsec. (d). Pub. L. 97–304, §2(a)(4)(A), substituted "section 1535(c) of this title" for "section 1535(a) of this title".

Subsec. (f). Pub. L. 97–304, §2(a)(4)(B), (C), (D), redesignated subsec. (g) as (f) and substituted "recovery plans (1) shall, to the maximum extent practicable, give priority to those endangered species or threatened species most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other developmental projects or other forms of economic activity, and (2)" for "recovery plans.". Former subsec. (f), relating to the promulgation of regulations, was struck out.

Subsec. (g). Pub. L. 97–304, §2(a)(4)(C), (E), redesignated subsec. (h) as (g), substituted reference to subsection (c)(3) of this section for reference to subsection (c)(2) of this section in par. (1), substituted "under subsection (a)(1) of this section" for "for listing" in par. (3), and substituted "subsection (f) of this section" for "subsection (g) of this section" in par. (4). Former subsec. (g) redesignated (f).

Subsec. (h). Pub. L. 97–304, §2(a)(4)(C), (F), added subsec. (h) and redesignated former subsec. (h) as (g).

1979—Subsec. (b)(1). Pub. L. 96–159, §3(1), required the Secretary's determinations to be preceded with a review of the status of the species.

Subsec. (f)(2)(B)(i). Pub. L. 96–159, §3(2), required publication of summary of text rather than of the complete text of proposed regulation specifying any critical habitat and inclusion of a map of the proposed critical habitat.

Subsec. (f)(2)(B)(iv)(II). Pub. L. 96–159, §3(3), substituted "if requested within 15 days after the date on which the public meeting is conducted," for "if requested,".

Subsec. (f)(2)(C). Pub. L. 96–159, §3(4), (5), inserted in introductory text ", subsection (b)(4) of this section,"; and in cl. (ii), included reference to significant risk to wellbeing of any species of plants, inserted in item (II) reference to regulation applicable to resident species of plants, extended the statutory period to a "240-day period" from a "120-day period", and provided for withdrawal of an emergency regulation without substantial evidence to warrant it, respectively.

Subsec. (h). Pub. L. 96–159, §3(6), added subsec. (h).

1978—Subsec. (a)(1). Pub. L. 95–632, §11(1), inserted provision requiring the Secretary, at the time a regulation is proposed, to specify by regulation any habitat of the species involved which is considered a critical habitat providing the species was listed subsequent to Nov. 10, 1978.

Subsec. (b)(4). Pub. L. 95–632, §11(7), added par. (4).

Subsec. (c)(1). Pub. L. 95–632, §11(2), struck out "and shall" after "if any" and inserted ", and specify any critical habitat within such range" after "endangered or threatened".

Subsec. (c)(2). Pub. L. 95–632, §11(6), substituted "within 90 days of the receipt of" for "upon" and "conduct and publish in the Federal Register a review of the status of" for "conduct a review of" and inserted a provision requiring that the review and findings be made and published prior to initiation of any procedures under subsec. (b)(1) of this section.

Subsec. (c)(4). Pub. L. 95–632, §11(3), added par. (4).

Subsec. (f)(2)(A). Pub. L. 95–632, §11(4)(A), substituted "Except as provided in subparagraph (B), in" for "In".

Subsec. (f)(2)(B), (C). Pub. L. 95–632, §11(4)(B), (C), added subpar. (B), redesignated former subpar. (B) as (C), and as so redesignated, substituted "Neither subparagraph (A) or (B)" for "Neither subparagraph (A)".

Subsec. (f)(3). Pub. L. 95–632, §13, substituted "a summary by the Secretary of the data on which such regulation is based and shall show the relationship of such data to such regulations" for "a statement by the Secretary of the facts on which such regulation is based and the relationship of such facts to such regulation".

Subsec. (f)(4), (5). Pub. L. 95–632, §11(4)(D), added pars. (4) and (5).

Subsec. (g). Pub. L. 95–632, §11(5), added subsec. (g).

1976—Subsec. (f)(2)(B)(ii). Pub. L. 94–359 substituted "subsection (b)(1)(A)" for "subsection (b)(A), (B), and (C)".

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1982 Amendment

Pub. L. 97–304, §2(b), Oct. 13, 1982, 96 Stat. 1416, provided that:

"(1) Any petition filed under section 4(c)(2) of the Endangered Species Act of 1973 [subsec. (c)(2) of this section] (as in effect on the day before the date of the enactment of this Act [Oct. 13, 1982]) and any regulation proposed under section 4(f) of such Act of 1973 [subsec. (f) of this section] (as in effect on such day) that is pending on such date of enactment [Oct. 13, 1982] shall be treated as having been filed or proposed on such date of enactment under section 4(b) of such Act of 1973 [subsec. (b) of this section] (as amended by subsection (a)); and the procedural requirements specified in such section 4(b) [subsec. (b) of this section] (as so amended) re-

garding such petition or proposed regulation shall be deemed to be complied with to the extent that like requirements under such section 4 [this section] (as in effect before the date of the enactment of this Act) were complied with before such date of enactment.

"(2) Any regulation proposed after, or pending on, the date of the enactment of this Act [Oct. 13, 1982] to designate critical habitat for a species that was determined before such date of enactment to be endangered or threatened shall be subject to the procedures set forth in section 4 of such Act of 1973 [this section] (as amended by subsection (a)) for regulations proposing revisions to critical habitat instead of those for regulations proposing the designation of critical habitat.

"(3) Any list of endangered species or threatened species (as in effect under section 4(c) of such Act of 1973 [subsec. (c) of this section] on the day before the date of the enactment of this Act [Oct. 13, 1982]) shall remain in effect unless and until determinations regarding species and designations and revisions of critical habitats that require changes to such list are made in accordance with subsection (b)(5) of such Act of 1973 [subsec. (b)(5) of this section] (as added by subsection (a)).

"(4) Section 4(a)(3)(A) of such Act of 1973 [subsec. (a)(3)(A) of this section] (as added by subsection (a)) shall not apply with respect to any species which was listed as an endangered species or a threatened species before November 10, 1978."

#### Abolition of House Committee on Merchant Marine and Fisheries

Committee on Merchant Marine and Fisheries of House of Representatives abolished and its jurisdiction transferred by House Resolution No. 6, One Hundred Fourth Congress, Jan. 4, 1995. Committee on Merchant Marine and Fisheries of House of Representatives treated as referring to Committee on Resources of House of Representatives in case of provisions relating to fisheries, wildlife, international fishing agreements, marine affairs (including coastal zone management) except for measures relating to oil and other pollution of navigable waters, or oceanography by section 1(b)(3) of Pub. L. 104–14, set out as a note preceding section 21 of Title 2, The Congress. Committee on Resources of House of Representatives changed to Committee on Natural Resources of House of Representatives by House Resolution No. 6, One Hundred Tenth Congress, Jan. 5, 2007.



## Subpart B—Revision of the Lists

### § 424.10  General.

The Secretary may add a species to the lists or designate critical habitat, delete a species or critical habitat, change the listed status of a species, revise the boundary of an area designated as critical habitat, or adopt or modify special rules (see 50 CFR 17.40–17.48 and parts 222 and 227) applied to a threatened species only in accordance with the procedures of this part.

### § 424.11  Factors for listing, delisting, or reclassifying species.

(a) Any species or taxonomic group of species (e.g., genus, subgenus) as defined in § 424.02(k) is eligible for listing under the Act. A taxon of higher rank than species may be listed only if all included species are individually found to be endangered or threatened. In determining whether a particular taxon or population is a species for the purposes of the Act, the Secretary shall rely on standard taxonomic distinctions and the biological expertise of the Department and the scientific community concerning the relevant taxonomic group.

(b) The Secretary shall make any determination required by paragraphs (c), (d), and (e) of this section *solely* on the basis of the best available scientific and commercial information regarding a species' status.

(c) A species shall be listed or reclassified if the Secretary determines, on the basis of the best scientific and commercial data available after conducting a review of the species' status, that the species meets the definition of an endangered species or a threatened species because of any one or a combination of the following factors:

(1) The present or threatened destruction, modification, or curtailment of its habitat or range;

390

(2) Overutilization for commercial, recreational, scientific, or educational purposes;

(3) Disease or predation;

(4) The inadequacy of existing regulatory mechanisms; or

(5) Other natural or manmade factors affecting its continued existence.

(d) In determining whether a species is a threatened species, the Services must analyze whether the species is likely to become an endangered species within the foreseeable future. The term foreseeable future extends only so far into the future as the Services can reasonably determine that both the future threats and the species' responses to those threats are likely. The Services will describe the foreseeable future on a case-by-case basis, using the best available data and taking into account considerations such as the species' life-history characteristics, threat-projection timeframes, and environmental variability. The Services need not identify the foreseeable future in terms of a specific period of time.

(e) The Secretary shall delist a species if the Secretary finds that, after conducting a status review based on the best scientific and commercial data available:

(1) The species is extinct;

(2) The species does not meet the definition of an endangered species or a threatened species. In making such a determination, the Secretary shall consider the same factors and apply the same standards set forth in paragraph (c) of this section regarding listing and reclassification; or

(3) The listed entity does not meet the statutory definition of a species.

(f) The fact that a species of fish, wildlife, or plant is protected by the Convention on International Trade in Endangered Species of Wild Fauna and Flora (see part 23 of this title) or a similar international agreement on such species, or has been identified as requiring protection from unrestricted commerce by any foreign nation, or to be in danger of extinction or likely to become so within the foreseeable future by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish, wildlife, or plants, may constitute evidence that the species is endangered or threatened. The weight given such evidence will vary depending on the international agreement in question, the criteria pursuant to which the species is eligible for protection under such authorities, and the degree of protection afforded the species. The Secretary shall give consideration to any species protected under such an international agreement, or by any State or foreign nation, to determine whether the species is endangered or threatened.

(g) The Secretary shall take into account, in making determinations under paragraph (c) or (e) of this section, those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

[49 FR 38908, Oct. 1, 1984, as amended at 84 FR 45052, Aug. 27, 2019]